In re Appropriation for Hwy. Purposes of Land of Winkelman.

126

(No. 1338—Decided February 21, 1968.)

Mr. *William B. Saxbe*, attorney general, *Mr. Harold B. Talbott* and *Mr. Allan D. Dobnicker*, for appellant Director of Highways.

*Messrs. Meredith, Meredith, Tait & Basinger*, and *Mr. Robert Tait*, for appellee landowner.

GUERNSEY, P. J.  This is an appeal on questions of law from a judgment of the Common Pleas Court of Allen County in an appropriation action.  The land involved is located along the west side of State Route 696, hereinafter referred to as Route 696, and the north side of U. S. Route 25, hereinafter referred to as Route 25, constituting the northwest quadrant of that intersection.

Some years ago Route 25 was a main north and south route commonly called the Dixie Highway and consisted

of a two-lane road. Subsequent to World War II and by means of various highway construction projects Route 25, in many locations between Bowling Green and Lima, was reconstructed and sometimes relocated to constitute a four-lane divided highway with access thereto limited to road intersections. As a result of this reconstruction some existing roads in the area were terminated at the boundary of the new limited-access highway, others intersected the new road at grade, and still others were carried across Route 25 on overpasses with ramps or interchange roads providing access to Route 25.

In this phase of highway development Route 25 was relocated to abut the subject property on the south and to form an at-grade intersection with Route 696 in such manner that all traffic traveling in either direction on one route had free access to pass to and travel in either direction on the other route. However, the land which is the subject of this appropriation action had direct access and right of ingress and egress to and from Route 696 only and had no access to Route 25 except over Route 696.

Subsequently, through co-operation between the U. S. government and the state of Ohio, planning and construction were initiated, again by numerous separate construction projects, to upgrade Route 25 between Bowling Green and Lima to meet federal Interstate Highway standards (see, for example, *In re Vacation of Road*, 6 Ohio App. 2d 73), which projects included, among other things, the elimination of crossings at grade, either by terminating the crossroads at the Route 25 boundaries, or by constructing overpasses to carry the crossroads over Route 25, either with or without interchange ramps. These construction projects were initiated over a period of many years, and at some stage of each project the affected section of Route 25 became a part of and thereafter known as Interstate Route 75 or, as we shall hereafter refer to it, as I-75.

In 1961, during this upgrading period, Winkelman, the affected landowner in this proceeding, acquired title to the vacant land in question and on January 16, 1961, leased it to the Standard Oil Company for service station purposes,

with rent fixed on a gallon delivered basis but at not less than $50 nor for more than $200 per month. The lease provided for termination by the lessee "in the event such use should be prevented or adversely affected by the widening, altering or improving of any street or road adjoining said premises or as a result of condemnation proceedings." At that time the lessee applied to the state of Ohio for a "permit" to build access drives for a filling station, but none was ever issued and no filling station was ever built, and after the payment of rent for four months at $50 per month the parties mutually agreed that no further rental would be paid under the lease for the time being. The lease was formally terminated about May 1966, when, in connection with a project to construct an overpass to carry Route 696 over I-75 and to provide interchange ramps, construction of a ramp was commenced on the property involved. It is from this construction project that this proceeding of the state of Ohio to appropriate the entire property arises.

Correspondence in evidence between the property owner and the state of Ohio and between the state of Ohio and Standard Oil Company, during the period from July 31, 1961, to October 15, 1963, indicates that from the outset of this period it was the announced intention of the state to make changes at the intersection but that delay was thereafter occasioned in the determination of the final character of the improvement and in purchasing or appropriating right of way by virtue of planning and authorization difficulties.

In the trial of this action two expert witnesses testified for the landowner and two expert witnesses testified for the state regarding the value of the land at the time of the take, which time was agreed by the parties to be on December 30, 1964.

William F. Smith testified for the landowner that the fair market value of the 1.60-acre tract "prior to the take" was $20,000; that he "appraised it as having access to 75," which access "is the thing that really makes the value of this parcel" and "increases its commercial potential"; that if it had "no legal compensable access" to I-75, the

value of the property would be less than $20,000; and that if it had "direct access to I-75" the value would have been higher than $20,000.

Richard Boehr testified for the landowner that the "value" of the property as of the date of the take was $25,000; that if, as of that date, "the property had no legal compensable right of access to 75" its value would be less than $25,000; and that if the property had access to U. S. 25, "that is, you could go right from the property to 25" the value would be much greater than $25,000, depending on what "the initiative of man and his own ability could use for this land."

Robert O. Motter testified for the state that the "value" of the property as of the date of the take was $3,750, based on residential use of the land; that he considered that the property did not have a highest and best use of commercial application because he didn't believe that anyone "would improve the property in light of the fact that it was uncertain as to how long they would have access *to the users of Interstate 75*" (emphasis added); that he considered "the privilege of use which any individual, including the landowner, would have of driving in for use of this property onto State Route 696 and thence onto Interstate 75" and found that that privilege had "no value due to the short term or possibility of a very short term of access"; that "Interstate Route 75 was designed as a limited access highway, and sooner or later, it would be expected that they would either dead end the road, or put in an interchange at that point" and that it was his feeling "that because of this, a prospective purchaser under the fair market value rule, would not buy for any commercial application"; that at the time he made his appraisal "it was more or less evident that there would be either a dead-end or an overpass, or an interchange at that intersection"; that he "took into consideration whether there was compensable right of access to I-75" and had been told by the Highway Department "that there was no compensable right of access"; that had there been compensable access the highest and best use of the property would have been as a "service station site," in which event twenty to

twenty five thousand dollars would be within the range that oil companies pay for such locations as this one; and that the property became residential rather than commercial "at the point of time when it became evident that they wouldn't have direct access," and that it first became evident when the state started working on overpasses and interchanges in both directions from this intersection.

Donald W. Kelley testified for the state that the fair market value of the property "prior to the appropriation on December 30, 1964" was $3,600; that "the critical consideration here is the analysis of the highest and best use, and in this regard, I want to state that I have made an assumption in my analysis under the highest and best use and this assumption is that the state of Ohio has the right to close the intersection of 696 and I-75; but that the owner has the privilege of using this property until that right is exercised"; that "it was necessary then to discover just what value this right or this privilege had, and in order to determine this, I made an investigation of the existing U. S. 75, and discovered that this road was constructed in 1953, or early '54"; that "my experiences in working on interstate highways, the federal government requires that there be no at grade crossing in order for the state to participate in federal funds, so based on this information, it seemed highly likely that this privilege of use would be of little value"; that Standard Oil "informed me that they would not be interested in this site in the event that that right was exercised"; that "the investors that I am familiar with would not make a substantial capital investment, either in terms of money in the case of a buyer, or in terms of a lease * * * when it was highly likely * * * that the right to close this intersection would be exercised"; that, "therefore, it was my opinion that the privilege of the owner to use that intersection until that right was exercised was of no value" and "the highest and best use was as a residential property"; that the property had had commercial value "until the time that the Standard Oil quit making lease rental payments"; and that if it were a commercial property it would be worth "somewhere in the vicinity of twenty thousand dollars."

During the testimony of each of the state's witnesses the landowner moved repeatedly to have same stricken, which motions the trial court took under advisement. At the close of the state's evidence the state moved to have the testimony "as to value" of the landowner's expert witnesses also stricken and then rested, whereupon the landowner rested. The trial court then overruled the state's motion as to the landowner's witnesses, sustained the motion of the landowner as to Mr. Motter's testimony, and overruled the motion of the landowner as to Mr. Kelley's testimony and explained, "as he gave an alternate figure." The landowner's attorney then stated that he would "withdraw from the consideration of the court and jury any value on behalf of the landowner in excess of twenty thousand dollars, and ask the court to direct the jury to return a verdict in this case for the landowner in the amount of twenty thousand dollars, on the basis that the testimony is uncontroverted that the highest and best use of the property under consideration is commercial." Upon consideration the court granted that motion and directed a verdict in such amount upon which judgment was thereupon entered. This is the judgment from which the Director of Highways perfected this appeal.

The Director of Highways assigns error of the trial court (1) in striking the testimony of the state's expert witness, Motter, (2) in overruling the motion to strike the valuation testimony of the landowner's expert witnesses, Smith and Boehr, and (3) in invading the province of the jury by directing the verdict.

The landowner has made certain references in his brief and in oral argument to the "affirmative act of the Department" of Highways in refusing to issue a "permit" which would enable the lessee to construct drives from its proposed filling station to the improved portion of Route 696, by reason of which "the lessee was denied the use of the premises." The trial court, in its opinion, stresses the "improper action" and "illegal action" of the state in advising the lessee that it "would not give them a right to make station entrances on the highway because it may be later needed for the Interstate system." Presumably,

the permit was sought under the provisions of Section 5515.01, Revised Code, "to use or occupy such portion of a road or highway on the state highway system as will not incommode the traveling public." That section also provides that "such permits, *when granted*, shall be upon the following conditions:

"* *. *

"(B) Such location shall be changed as prescribed by the director when he deems such change necessary * * * in connection with or *contemplation of* the construction, reconstruction, improvement, relocating, maintenance, or repair of such road or highway.

"* * *

"(F) Such other conditions as may seem reasonable to the director, * * *." (Emphasis added.)

It will be noted that that section does not impose upon the director any mandatory duty to grant a permit and that the conditions thereof are largely within his discretion, including his right to prescribe a change in location in *contemplation* of a road relocation. It would logically follow that, when, as here, he reasonably contemplates a road relocation which would prevent the use or occupancy of the highway in the manner proposed by the applicant, the director would be within the exercise of his statutory prerogatives in not granting a permit for such use or occupancy. In seeking the permit the lessee of the landowner determined the vulnerability of his proposed capital investment to loss by reason of contemplated highway improvements, and the state did not deny to him or to the landowner anything which they were entitled to have as a matter of right. In any event in this appropriation action the landowner is entitled to recover the fair market value of the premises, no more and no less, as determined by a properly instructed jury. He is not entitled to recover any penalty or any additional damages arising from a supposed invasion of his rights by the state in not issuing to him or his lessee the permit here sought.

There also seems to be some expression of thought that the take of these premises may have been at a time when

the existence of an extensive highway improvement pro-gram in the area became so apparent as to commence to de-press land values at locations where intersections at grade might be eliminated. See, however, *McKee* v. *Akron*, 176 Ohio St. 282; *State, ex rel. Andersons*, v. *Masheter, Dir.*, 1 Ohio St. 2d 11; and *State, ex rel. Fejes*, v. *Akron*, 5 Ohio St. 2d 47. See, also, *Director of Highways* v. *Olrich*, 5 Ohio St. 2d 70. The parties have stipulated that the date of the take was December 30, 1964. Such stipulation was not withdrawn, and in our determination of this appeal we will honor same. Our application of the law will be on the basis of this date of take and no other.

Much of the difficulty encountered by the trial court in this case arises from its interpretation of the application of the case of *In re Appropriation for Highway Purposes*, 6 Ohio App. 2d 6, decided by this court on March 30, 1966, wherein we held:

"5. The *privilege* of the owners of a motel property and their actual and potential customers, shared by them with the general public, of entering and leaving an abut-ting limited-access state highway through an intersection of same with a township road, and by way of such town-ship road reaching the motel property which has no *right* of direct access to and from that state highway, is an ele-ment entering fairly into the question of market value. This element must be taken into consideration in deter-mining the market value of the motel property as of the time of the take of a part of it in the improvement of such state highway to an interstate highway. In such deter-mination there must also be considered as an element of, and as affecting market value, the *right* which the state had prior to and at the time of the take to proceed, without compensation to the landowners, to alter the highway inter-section in such manner as to leave no access from the town-ship road to the highway, or vice versa, resulting in cir-cuity of travel between the motel property and the high-way."

That case involved the same underlying situation with respect to the upgrading of Route 25 by the elimination

of intersections at grade to become a part of the Interstate Highway System. However, in that case no substantial question arose as to the highest and best use at the time of the take of the property involved because it already was then so used for motel purposes. In that case there was only a partial take of the landowner's property, whereas here there is a complete take. There the indirect access between the motel property and the principal highway was completely terminated by the construction of an overpass over Route 25, without interchange ramps, whereas here the improvement consists of the construction of an overpass carrying Route 696 and interchange ramps between that route and I-75.

Nevertheless, the same basic rules pertaining to compensation and valuation are applicable in both cases. Here, as there, the landowner never had a *right* of access to Route 25 and his *privilege* of indirect access thereto by way of a secondary highway could be terminated or altered by the state at any time it should see fit to do so. When such termination or alteration results merely in circuity of travel to reach the principal highway it does not constitute a taking of any property right belonging to the landowner for which he is entitled in an appropriation action to either compensation or damages. *Rothwell* v. *Linzell, Dir.*, 163 Ohio St. 517; *State, ex rel. Merritt, Dir.,* v. *Linzell,* 163 Ohio St. 97; and *In re Appropriation for Highway Purposes, supra* (6 Ohio App. 2d 6). Compare, *Bellevue, ex rel. Vickery, Solicitor,* v. *Stedman,* 138 Ohio St. 281. Stated in another way, the owner of land abutting on a highway has no property right in the continuation or maintenance of the flow of traffic past his property, and the diversion of traffic as the result of an improvement in the highway or the construction of an alternate highway is not an impairment of a property right of such owner for which damages may be awarded, and is noncompensable. *State, ex rel. Merritt, Dir.,* v. *Linzell,* 163 Ohio St. 97, and *New Way Family Laundry, Inc.,* v. *Toledo,* 171 Ohio St. 242. In this reference and to this extent the termination or alteration of the *privilege* of access is not "legally compensable" to the landowner.

However, when some land is actually taken, the landowner may derive indirect compensation by reason of the previous existence of such privilege as a positive element of market value, serving to increase the market value of the land involved. Nevertheless, the negative element of market value, to the extent that it exists at the same point of time, of the right of the state to terminate or alter the indirect access must also be taken into consideration, and if its opposite effect on market value is of such weight as to counterbalance the effect of the positive element of privilege there will result no net indirect compensation to the landowner by virtue of the existence of such privilege. Each element must be given its appropriate weight as such weight is in the situation which exists at the moment prior to the take to determine the net effect thereof on market value. By way of illustration and with particular reference to the situation which existed along Route 25 we observe that at the time when it was first constructed as a divided highway with access limited to road intersections at grade such access made land fronting on secondary roads, located near such intersections and having indirect access to the primary highway over the secondary roads, particularly desirable for use for primary highway service-type businesses. At that time no general program of eliminating such intersections existed or was reasonably contemplated and the element of privilege of access in its bearing on market value greatly counterbalanced the opposite effect thereon of the right of the state to terminate or alter such indirect access, the possibility of which was then remote. However, as time passed, and the Interstate Highway System came into being, resulting in the construction of entirely new roads and the upgrading of other roads of the state highway system to meet interstate highway standards, and, in the context of this case, whenever the state of Ohio began a program of co-operation with the federal government to upgrade an existing state highway to meet interstate highway standards, it became evident that sooner or later each intersection at grade along that highway would be eliminated. As more time passed this eventuality drew closer and the threat, arising from such

general program of highway improvement, of the exercise of the right of the state to terminate or alter the indirect privilege of access at an intersection, became greater daily and, as an element of market value, tended more and more to counterbalance the opposite effect on market value of the existence of the privilege of indirect access.

These same considerations, and the fluctuations thereof, would, of course, have continuous and changing bearing upon market value because of their bearing on the suitability of use of a piece of property for specific purposes and on whether a piece of land was suitable for a higher and better use than its actual use. These elements of value, both in positive and negative aspect, would act similarly on all properties in the neighborhood of such intersections increasing their market values when the foreseeability of their future use for main highway service-type businesses appeared favorable and diminishing such value when same appeared unfavorable, and would have such effects independently of the existence, or lack thereof, of a specific proposal to change the particular intersection near which such properties were located. Usually the adoption of a specific plan or proposal would merely confirm what already had been threatened by the general program and by activity elsewhere.

These negative impacts upon market value created or caused by a general improvement program and by the potential threat, but not the actuality, of an improvement in immediate proximity to the land in question are comparable to consequential damages, which differ in degree but not in kind from that of the general public, and are not recoverable even when the improvement is in the immediate vicinity, being *dammum absque injuria*. See, for example, *New York, Chicago & St. Louis Rd. Co.* v. *Busci*, 128 Ohio St. 134, 93 A. L. R. 632; and *Smith* v. *Erie Rd. Co.*, 134 Ohio St. 135. Nor may we apply the rule, if a valid one, of the case of *Cleveland* v. *Carcione*, 118 Ohio App. 525, providing for the determination of market value without reduction for the depreciation arising from a general plan of condemnation, for in that case the land was actually in-

cluded in the area to be condemned and the improvement program concerning that land was actual, not merely potential, and the damages to the landowners differed in kind as well as in degree from that of the general public. Here, the program was potential only until immediately before the take.

On the other hand, however, we have the corollary rules having to do, not with the imminence or threat of an improvement, but with the actual proposal or construction of an improvement, i. e., in determining market value of the property at the time it is taken the jury may not consider the fact that the value of the property has been either increased or decreased by the proposal or by the construction of the improvement. *Akron* v. *Alexander*, 5 Ohio St. 2d 75. These rules require us, in determining market value, to consider the land in question in the situation which existed the moment before the take and to apply thereto all the elements having bearing on market value, which an ordinarily prudent business man would consider in his appraisement thereof; but we must exclude from these elements any which are based on the actuality of the proposal of or the construction of the improvement at that particular place. The result, of course, is an artificial and hypothetical situation, but to this there is no alternative. Thus, an appraiser must consider the potential threat or imminence of an intersection change which arises from the general program raising certain highways of the state highway system to meet the federal standards applying to the Interstate Highway System, but the market value so determined may not reflect either, in increase or decrease, the existence of actual plans for or the construction of an improvement to the intersection at that particular location.

We appreciate that in many cases the net result will be the same, i. e., where the potential threat or imminence of an intersection change arising from a general upgrading program is so great that an ordinarily prudent business man would not consider the privilege of indirect access as having any immediate or future value then the actuality of a proposal of an improvement or the construction there-

of will not serve to further reduce the net market value in such instance.

In summary then, we find that, in determining the market value of land taken for a highway improvement which consists of the elimination of an intersection at grade, the case must be considered in the light of its own facts and every element that can fairly enter into the question of value, and which an ordinarily prudent business man would consider before forming judgment in making a purchase, should be considered, and the market value of the land shall be determined on the basis of the circumstances existing the moment before the take. Under such circumstances, the *privilege* that the owners of the land share with the general public of entering and leaving a nearby limited-access primary highway through an intersection of same with a secondary highway, and by way of such secondary highway reaching the land in question which has no *right* of direct access to and from the primary highway, is an element entering fairly into the question of market value and which must be considered as of such moment to the degree that it has positive effect on market value. Similarly, the *right* which the state has to proceed, without compensation to the landowner, to alter the highway intersection in such manner as to terminate or diminish the access from the secondary highway to the primary highway, or vice versa, which will result in circuity of travel between the land in question and the primary highway and/or the diversion of traffic flow away from the land in question, must also be considered as of such moment, to the degree that it has negative effect on market value. With respect to this latter element of market value the existence of a general highway improvement program consisting of the upgrading of highways to meet interstate highway system standards by the elimination of intersections at grade must be given consideration and application to the extent that the threat and imminence of intersection change arising from such program would be considered by an ordinarily prudent business man in determining the desirability and advisability of development of

such land for a primary highway service-type business and its effect on the value thereof. Although, this *general* imminence or threat of intersection change should be considered to such degree, the *specific* proposal or initiation of construction to change the intersection at the location in question may not be considered as an element bearing either positively or negatively on market value.

Applying these rules then to the testimony of the landowner's expert witnesses, Smith and Boehr, we find that their testimony as to market value had no probative value because it is fully apparent therefrom that in determining market value each took into consideration the privilege of indirect access without giving any consideration to the negative influence thereon of the element of the right of the state to alter the intersection. It is apparent from the landowner's own evidence that any ordinarily prudent business man would have taken this negative factor into consideration on December 30, 1964, the stipulated time of the take, as the landowner, himself, and the Standard Oil Company took this into consideration almost four years earlier by providing for the termination of their lease "in the event such use [service station] should be prevented or adversely affected by the widening, altering or improving of any street or road adjoining said premises." On the other hand, the testimony of the state's witnesses shows that they each took both positive and negative elements into consideration in arriving at their opinion of market value. There is nothing in the testimony of either state expert to show that in considering the negative element they considered the actuality of the intersection improvement at that location rather than the mere possibility thereof, and their testimony thus had probative value within the scope of the rules aforementioned.

For these reasons we conclude that the court did commit error prejudicial to the appellant in striking all the testimony of witness Motter. As there was some testimony of each of the landowner's witnesses, Smith and Boehr, having general pertinency as to valuation, including their testimony that they would give the land a lower value

if it had no "legal compensable right of access to 75," the trial court did not commit error in overruling the motion of the state to strike the "valuation testimony" of Smith and Boehr, but if the case had gone to the jury their respective dollar opinions of market value of $20,000 and $25,000 should have been excluded from the jury's consideration. In this relation it should be noted that the state made no objection to such testimony at the time thereof. There remaining conflicting testimony as to value, the court did, of course, commit error prejudicial to the appellant in taking the case from the jury by directing a verdict for the landowner. That being so, we do not comment upon or determine the right of a court to take an appropriation case from the jury and direct a verdict as to value when the evidence as to value is undisputed.

For these prejudicial errors the judgment of the Common Pleas Court is reversed and the cause remanded thereto for new trial and further proceedings as provided by law.

*Judgment reversed.*

YOUNGER, J., concurs.

There presently being a vacancy on this Court, the two remaining Judges constitute a quorum to render judgment. Section 2501.07, Revised Code. The parties to this appeal have also waived having a third Judge to hear and determine same.