DECISION. *Page 3 
{¶ 1} Plaintiffs-appellants/cross-appellees the Hamilton County Board of Commissioners and the City of Cincinnati ("city and county") appeal from the jury verdict in an appropriation action awarding $3.5 million to defendant-appellee/cross-appellant OTR, the statutory nominee for the State Teachers' Retirement Board of Ohio. The damages were awarded to compensate OTR for the taking of its right of access where an elevated walkway had connected the Cincinnati riverfront to Atrium Two, an office building owned by OTR.
 {¶ 2} The city and county have raised five assignments of error for our review. OTR has raised two assignments of error in a cross-appeal. For the following reasons, we affirm the jury's award of damages.
 Factual Background {¶ 3} This is not the first time that a dispute between these parties pertaining to Atrium Two has appeared before this court. In OTR v.Cincinnati,[1] we determined that OTR was entitled to a writ of mandamus to compel the appropriation action that is the subject of the current appeal. OTR v. Cincinnati contains a detailed explanation of the factual history between these parties. In the present case, a brief summary of the events leading up to this litigation will suffice.
 {¶ 4} OTR is an entity that handles the investments of the State Teachers' Retirement System. Included in these investments are numerous properties and office buildings. OTR owns and invests in these properties to generate income used to pay benefits to members of the State Teachers' Retirement System. *Page 4 
 {¶ 5} As relevant to this litigation, OTR owns the Atrium Two office building in downtown Cincinnati. Atrium Two is located at the intersection of Fourth and Sycamore Streets and is a Class A office building. Class A buildings are the highest recognized class of office structures, have a prominent appearance, and generally attract high-profile tenants. Atrium Two was constructed in 1983-1984 and, as a part of the city's Urban Renewal Plan, was built with an elevated walkway connecting its southern entrance to the Cincinnati riverfront. The walkway spanned Fort Washington Way and provided direct access to parking and events on the river. Atrium Two was designed to accommodate a connection to the walkway and was built in reliance upon the walkway providing access to riverfront parking. Consequently, the building was granted a variance from the city and was built with a parking garage containing only approximately 150 spaces, substantially fewer spaces than a building the size of Atrium Two would normally require. Atrium Two was also required to grant the city a public easement, allowing pedestrian access through its lobby and to the elevated walkway 24 hours a day.
 {¶ 6} The plaza and lobby of Atrium Two surrounding the entrance to the elevated walkway were decorated and accessorized with greenery. This southern entrance, at the 530-foot elevation level, became the building's premier access point.
 {¶ 7} In the mid-to late 1990s, the city revised its urban renewal plan. The revised plan completely redesigned Fort Washington Way. The highway was narrowed considerably, freeing up land to its south. The city's street grid was altered, providing additional access to the riverfront over Fort Washington Way. Pedestrian access to the riverfront via the continuation of existing streets became more feasible.
 {¶ 8} The amended urban renewal plan also called for the elimination of the elevated walkway connecting Atrium Two to the riverfront. The walkway was closed on October 2, 2000. OTR sought a preliminary injunction prohibiting the *Page 5 
destruction of the walkway, but the trial court denied its request. OTR then asked the trial court to issue a writ of mandamus to compel the city and county to initiate an appropriation action to compensate OTR for the taking of its property rights in the elevated walkway. The trial court refused, and OTR appealed to this court. We determined that OTR did have a right of access at the 530-foot elevation, and that the demolition of the elevated walkway had substantially interfered with this right.[2]
 {¶ 9} But we further determined that OTR had no specific contractual right of access to any riverfront parking.[3] Following our conclusion that OTR was entitled to a writ of mandamus compelling the city and county to initiate an appropriation action for the loss of access at the 530-foot elevation, we remanded the cause for further proceedings.
 {¶ 10} The city and county commenced the appropriation action. At trial, OTR presented testimony from three witnesses regarding the loss in value to Atrium Two following the removal of the elevated walkway. These witnesses stated the loss in value to be $4.2 million, $6 million, and $10 million, respectively. The city and county also presented valuation testimony from two witnesses, who stated the loss in value to Atrium Two to be $160,000 and $18o,000. The jury awarded OTR damages in the amount of $3.5 million. The present appeal ensued.
 Subject-Matter Jurisdiction {¶ 11} In their first assignment of error, the city and county argue that the trial court exceeded its subject-matter jurisdiction by allowing the jury to directly value property rights that had not been appropriated, specifically, the right to parking on Cincinnati's riverfront. *Page 6 
 {¶ 12} In support of their argument, the city and county rely onProctor v. Thieken.[4] In Thieken, also an appropriation case, the Fourth Appellate District concluded that the trial court had exceeded its subject-matter jurisdiction by permitting the jury to determine if there had been a taking of the defendant's property and rights in addition to the taking described in the complaint.[5]
 {¶ 13} Thieken owned property that had been affected by a project conducted by the Ohio Department of Transportation ("ODOT"). ODOT had installed concrete curbs along various state routes, one of which ran along Thieken's property. ODOT had filed a complaint to appropriate both a portion of Thieken's acreage and a temporary easement in his property. But Thieken argued that ODOT's actions had also unreasonably interfered with his right of access to the property. In response, ODOT argued that the trial court lacked jurisdiction to consider Thieken's argument. Despite ODOT's objection, the trial court specifically instructed the jury to consider whether ODOT had substantially interfered with Thieken's right of access.
 {¶ 14} On appeal, the Fourth Appellate District reversed. It determined that the trial court did not have jurisdiction to determine if there had been an additional taking outside of the takings listed in the complaint. It further stated that Thieken should have pursued a mandamus action to compel appropriation proceedings for the loss of access.[6]
 {¶ 15} Contrary to the city and county's assertion, Thieken is not factually analogous to the case at bar, and it does not support their argument. OTR had already filed a mandamus action, in which this court determined that the only right that had been appropriated was OTR's right of access at the 530-foot elevation. Unlike Thieken, the trial court in this case did not instruct the jury to consider *Page 7 
whether additional rights had been appropriated. In fact, the trial court repeatedly instructed the jury that OTR had no right to riverfront parking and was not to be compensated for any such loss. During the trial, the court attempted to aid the jury by framing the issue. It instructed the jury that "OTR had no right, contractual or otherwise
inherent right to the parking across the street any more than anybody else did or anywhere else along the riverfront. So it is a little bit of a difficult thing. There is an obligation there for the right of access, but on the other side of the skywalk, there was no right they had to any of that parking garage. The City and County were perfectly within their rights to tear down Cinergy Field and the parking garage attached to it."
 {¶ 16} Later in the trial, the court further stated, "[T]here is no agreement in this case or otherwise for the County to provide any parking for this building. Obviously, the building was constructed. The reasons for its construction I allowed to be heard in evidence but there isn't an obligation for the County to provide any parking nor any right [or] expectation for them to have any parking * * * But there is no right that Atrium [Two], regardless who owns it, has to any parking in any particular spot on the Riverfront in the before scenario or now, in the after scenario."
 {¶ 17} And in its jury instructions, the court stated, "[t]he property right that was taken is the access to the elevated walkway of the public right away at the 530-foot elevation * * *[n]either Hamilton County nor the City of Cincinnati had any obligation at any time to provide the Atrium [Two] building with parking that from time to time existed on Cincinnati's central riverfront. OTR did not have any express contractual right to access to riverfront parking at any time."
 {¶ 18} These are just a few excerpts from a lengthy trial. But we are convinced that the trial court went to great lengths to ensure that the jury was aware that OTR was not entitled to compensation for any loss of parking. The issue before the jury was complicated, which the trial court recognized during a side-bar *Page 8 
conference with counsel: "[T]he longer I sit here, the more convinced I become that the two are intertwined. It is a difficult thing that's been left here, you have to value access to something that you have no right to." The trial court clarified this intricate relationship by providing the above instructions.
 {¶ 19} Evidence concerning access to parking was admitted during trial. But, as explained below, this evidence was admitted for a particular purpose. Given that the trial court repeatedly instructed the jury that OTR had no right of access to riverfront parking and could not be compensated for the loss of such parking, we conclude that the trial court did not exceed its subject-matter jurisdiction by allowing the jury to directly value loss of parking.
 {¶ 20} The city and county further argue in this assignment of error that the trial court exceeded its jurisdiction by allowing the jury to indirectly value loss of parking and loss of traffic flow as part of a fair-market-value calculation. They contend that it was improper for Raymond Jackson and Jerry Fletcher, appraisers hired by OTR, to testify concerning the availability of inexpensive parking when discussing fair-market value. The city and county specifically argue that, because the losses of parking and traffic flow were shared in common with the general public, they may not be considered in determining fair-market value.
 {¶ 21} We first note that a calculation of fair-market value was necessary to determine OTR's damages. The jury was instructed that, "[t]o determine what damages are to be awarded you must determine what decrease there was in fair market value of the Atrium [Two] building as a result of the taking that occurred."
 {¶ 22} To support their contention that loss of parking and loss of traffic flow were not relevant in a fair-market value calculation, the city and county rely on a series of cases that they argue establish that inconveniences and losses shared with *Page 9 
the general public are not compensable.[7] But the loss suffered by OTR was not shared with the general public. As this court determined inOTR v. Cincinnati, Atrium Two was specifically built in reliance upon access at the 530-foot elevation.[8]
 {¶ 23} Other downtown buildings with employees who used the elevated walkway to access riverfront parking were not similarly built in reliance upon such access. Because Atrium Two was designed to connect to the walkway at the 530-foot elevation, it was granted a variance from the city to be constructed with a smaller parking garage than required. Thus, the elimination of access at the 530-foot elevation affected Atrium Two more significantly than it affected other downtown buildings.
 {¶ 24} Further, because Atrium Two was required to grant the city an easement through its lobby, it became a pedestrian hub. The case law relied upon by OTR regarding loss of traffic flow concerns loss of traffic flow past a premise, generally due to the relocation or elimination of a roadway. But OTR experienced a loss of traffic flowthrough its premises. Such a loss was experienced by OTR alone. "[C]ircuitry of travel to and from real property is not compensable, but circuitry of travel created within the owner's property is compensable."[9] Accordingly, we conclude that OTR suffered a loss different than that suffered by the general public.
 {¶ 25} When determining fair-market value, "every element that can fairly enter into the question of value, and which an ordinarily prudent business man would consider before forming judgment in making a purchase, should be considered."[10] Given that Atrium Two was built in reliance upon access at the 530-foot elevation and was constructed with only approximately 150 parking spaces, we *Page 10 
conclude that evidence concerning available parking around Atrium Two, as well as the amount of pedestrian traffic flow through the building, would be relevant considerations to an ordinarily prudent businessperson. The trial court did not err in so determining, and it did not exceed its subject-matter jurisdiction in allowing evidence concerning parking and traffic flow for such a purpose.
 {¶ 26} The city and county's first assignment of error is overruled.
 Evidentiary Issues {¶ 27} In their second assignment of error, the city and county challenge the trial court's admission of allegedly irrelevant and prejudicial evidence. They first argue that the trial court erred in admitting evidence concerning the value of public parking in relation to compensation, the cost to cure the problem, and fair-market value. They next argue that it was error to admit evidence concerning a prior agreement between the city and the developer of Atrium Two.
 {¶ 28} The trial court has broad discretion concerning the admission and exclusion of evidence, and we will not reverse in the absence of a clear abuse of discretion.[11]
 1. Public Parking {¶ 29} The city and county specifically argue that the trial court erred in admitting "evidence of the value of public parking as both compensation for a right taken and as part of a cost to cure." They also reiterate their argument that the cost of public parking was not relevant to a fair-market-value analysis.
 {¶ 30} But, as we have explained, the trial court repeatedly instructed the jury that OTR had no right to riverfront parking and could not be directly compensated *Page 11 
for its loss. We have also already determined that, based on the unique facts associated with the construction of Atrium Two, the availability and cost of public parking was a relevant factor in a fair-market-value analysis. Evidence concerning the cost of parking was properly admitted for this purpose.
 {¶ 31} The city and county argue the impropriety of appraiser Raymond Jackson's testimony concerning the cost to correct Atrium Two's parking problem. Jackson's testimony was summarized in an exhibit and put on display for the jury. Jackson testified about four potential "parking solutions" for Atrium Two. He opined that Atrium Two could acquire nearby land at a cost of approximately $3.3 million; it could build a parking garage at a cost of approximately $9.6 million; it could purchase an existing parking garage at a cost of approximately $4.4 million; or it could subsidize parking for approximately $1.6 million.
 {¶ 32} The city and county correctly assert that OTR was not entitled to damages for the cost to cure its parking problem. But Jackson's testimony was not offered as an assertion that OTR should receive compensation for the cost to cure the problem. Jackson stated that he was aware that Atrium Two had no express or contractual right to riverfront parking. Rather, he felt cost-to-cure information would be an important consideration to a willing buyer. In other words, it was a relevant factor in a fair-market-value determination.
 {¶ 33} Direct testimony regarding the cost to cure Atrium Two's parking problem was provided by OTR's appraiser Jerry Fletcher. But the city and county elicited this testimony and cannot claim resulting error on appeal.
 {¶ 34} Before Fletcher testified, he was subject to a voir dire examination in which he stated that he had utilized four approaches to calculate the loss in value to Atrium Two: a cost-to-cure approach, a cost approach, a sales-comparison approach, and an income approach. Following the voir dire examination, the trial court determined that Fletcher's cost-to-cure approach had been predicated on *Page 12 
Atrium Two having a right of access to riverfront parking. The trial court accordingly prohibited OTR from questioning Fletcher regarding this approach. OTR complied with the trial court's order and solely questioned Fletcher about his three remaining approaches to valuation.
 {¶ 35} But, shortly after beginning cross-examination, the city and county asked Fletcher, "And then in addition to the standard three [approaches], which [are] cost, sales comparison and income, I understand you also did a cost to cure which you are saying you didn't put any weight on?" The trial court responded by stating, "Go ahead and answer the question. It has been raised now." The city and county proceeded to question Fletcher further regarding the cost-to-cure approach.
 {¶ 36} Because the city and county elicited the testimony on the cost to cure, they cannot now claim resulting error from its admission. "A party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make."[12]
 {¶ 37} We have conducted a detailed review of the record and have determined that the vast majority of evidence regarding parking (other than the cost-to-cure evidence, which we have already discussed) was relevant to a fair-market-value analysis and was not offered as proof that OTR was entitled to direct compensation for loss of parking. In fact, all of OTR's witnesses who provided valuation testimony stated that they were aware that Atrium Two had no right to riverfront parking.
 {¶ 38} But one witness' testimony concerning parking did give us pause. OTR presented the testimony of Anita Schaefer, an employee of Atrium Two's tenant Cinergy Services. Among other topics, Schaefer testified regarding her experiences *Page 13 
accessing parking via the elevated walkway and, following the elimination of the walkway, via downtown streets. Schaefer testified that she had felt safe while using the elevated walkway, and that the covered walkway had sheltered her from the outdoor elements. But Schaefer testified that after the removal of the walkway, she no longer felt as safe traveling to and from her car. She stated that she had been followed, and that she had almost been hit by a vehicle while she was using a crosswalk.
 {¶ 39} We fail to see how this testimony relates to Atrium Two's loss of access or the affect of such loss on the building's value. Atrium Two had no right to the physical walkway or to parking on the riverfront, and Schaefer's testimony was irrelevant to the issue at bar. But despite the impropriety of Schaefer's testimony, we conclude that its admission was harmless error, and that the city and county were not prejudiced.[13] Schaefer did not provide valuation testimony for the jury to consider. And her testimony concerning the covering over the walkway was duplicative of other evidence adduced at trial.
 {¶ 40} Accordingly, we conclude that the trial court did not abuse its discretion in admitting evidence of public parking because, other than the exceptions discussed above, the evidence was relevant to a fair-market-value analysis.
 2. Prior Agreement {¶ 41} The city and county next argue that the trial court erred in admitting testimony from Nell Surber and David Warner regarding the construction of Atrium Two and the city's desire that employees of Atrium Two use riverfront parking. The city and county argue that this testimony was improper because Atrium Two had no right of access to riverfront parking. *Page 14 
 {¶ 42} Nell Surber testified that she had been the city's Director of the Department of Economic Development when Atrium Two was constructed. Surber had been involved with the urban renewal that took place in the 1970s and 1980s, particularly with the construction of downtown parking and the development of the "skywalk" system. Regarding parking, Surber testified that new buildings were required to have approximately one parking spot for every thousand square feet in the building. But the city did not want surface parking constructed because it was unsightly.
 {¶ 43} With these concerns in mind, the city modified its skywalk system to connect directly from the riverfront to Atrium Two, providing the building with direct access to riverfront parking. The connection of the skywalk in this manner was provided for in the city's urban renewal plan. The city additionally passed an ordinance granting Atrium Two a variance in the city's parking regulations.
 {¶ 44} David Warner was the developer and initial owner of Atrium Two. Warner testified that he had dealt principally with Nell Surber during Atrium Two's development. Warner stated that the city had precluded him from building above-ground parking for aesthetic reasons, and, consequently, that Atrium Two had been built with limited parking and had been designed to connect to the walkway system.
 {¶ 45} Surber and Warner's testimony was not improper. As this court determined in OTR v. Cincinnati, OTR had a right of access at the 530-foot elevation. Surber and Warner's testimony explained the process and events that had created OTR's right of access. The testimony did not indicate that OTR had a right to riverfront parking. Because this testimony explained the development of OTR's right of access, as well as explained why Atrium Two had been constructed with substandard parking, we conclude that the trial court did not abuse its discretion in admitting it.
 {¶ 46} The second assignment of error is overruled. *Page 15 
 Jury Instructions {¶ 47} In their third assignment of error, the city and county argue that the trial court erred in failing to give the following requested jury instruction: "Damage to the property resulting from the exercise of eminent domain may be recovered only for damages not common to the public. Consequential damages such as circuitry of travel [or] loss of traffic volume suffered by the owner in common with the public are not to be considered."
 {¶ 48} Because we have already determined that OTR did not suffer a loss shared in common with the public, this instruction would not have been appropriate. As we have stated, not only had Atrium Two been built in reliance on access at the 530-foot elevation and been granted a variance in the city's parking requirements, but it had also been required to grant the city an easement through its lobby, allowing for constant pedestrian access. Following the closure of the walkway, Atrium Two suffered a loss of traffic flow through its lobby.
 {¶ 49} Although the requested instruction contains a correct statement of the law,[14] it is inapplicable to the facts of this case. Consequently, the trial court did not err in excluding this jury instruction, and the third assignment of error is overruled.[15]
 Damages Awarded {¶ 50} In their fourth assignment of error, the city and county argue that the jury's award for damages to the building was not supported by the sufficiency or the weight of the evidence.
 {¶ 51} The jury verdict form contained three blank lines. The first line provided for "[c]ompensation for the property right that was taken." The second line *Page 16 
provided for "[d]amages to the building." And the third line simply provided for the sum of the first two lines.
 {¶ 52} An explanation of "damages to the building" was provided in the jury instructions: "In addition to compensation for the property right taken, the owner is entitled to any decrease in fair-market value of the building that is a direct result of the appropriation. If the building is less valuable because of the severance of the access to the elevated walkway, then you must consider such injury and determine the amount of such decrease in the fair market caused by the severance of the access to the elevated walkway. This will be the amount awarded for damages to the building."
 {¶ 53} The jury awarded $2.5 million for compensation for the property right taken and $1 million for damages to the building. The verdict form does not specify how the jury arrived at these numbers or what evidence the award was based upon.
 {¶ 54} Much testimony was presented concerning the damage to the building and the decrease in fair-market value. OTR presented the testimony of Raymond Jackson, owner of the Jackson Advisory Group, Inc., a real estate consulting firm. Jackson testified that he had employed three traditional methods in appraising the loss in value to Atrium Two: the cost approach, the sales-comparison approach, and the income approach. The cost approach is somewhat difficult to conceptualize, but, as Jackson explained, "[it] incorporates a land value. Then you come up with what the cost to rebuild or replicate that facility is. You deduct an appreciation, come up with indicated value." The sales-comparison approach, as its title indicates, compares sales of similar properties in the area. The income approach compares income brought in by Atrium Two before and after the appropriation.
 {¶ 55} Before explaining the results of his approaches, Jackson testified about specific damage to the residue of Atrium Two following elimination of the walkway. Jackson determined that it would cost approximately $1 million to restore access on *Page 17 
the south side of Atrium Two at the 530-foot elevation. But Atrium Two did not own the land that this access would attach to, and the $1 million figure did not account for the necessary land acquisition. Jackson further testified that Atrium Two was affected by the loss of foot traffic through its lobby. As a result, the building's first two floors would no longer be ideal for retail and restaurant space. This space would have to be renovated, which Jackson opined would cost approximately $600,000.
 {¶ 56} Considering these figures, Jackson determined that under the cost approach, Atrium Two had suffered a $5.525 million loss in value. Under the sales-comparison approach, Jackson determined that, before the appropriation, Atrium Two had been worth $110 per square foot, and that, following the appropriation, it was worth $104.53 per square foot, for a loss in value of approximately $3.6 million. Lastly, Jackson discussed the income approach. He had calculated the loss in value under this approach in two ways, and he had settled on the average of his two results, for a loss in value of $4.7 million. Jackson ultimately reconciled all three approaches and determined that Atrium Two had experienced a loss in value of $4.2 million.
 {¶ 57} OTR additionally presented valuation testimony from real-estate appraiser Jerry Fletcher. Fletcher testified that he had calculated the loss in value to Atrium Two under the cost, sales-comparison, and income approaches. Fletcher first derived the value of Atrium Two before the closure of the walkway under each approach. He reconciled the different valuations, placing the most weight on the income approach, and settled on the overall value of Atrium Two to be $79,600,000. Fletcher next determined the value of Atrium Two after the appropriation under all three approaches. He again reconciled the various approaches and determined that Atrium Two was worth $73,600,000 after the appropriation. Thus, as a result of the appropriation, Fletcher opined that Atrium Two had suffered a loss in value of $6 million. *Page 18 
 {¶ 58} The third witness presented by OTR to provide valuation testimony was Todd Honeycutt. Honeycutt was employed by OTR and was its senior asset manager for the Midwest region. Honeycutt was responsible for managing various properties owned by OTR, including Atrium Two. Honeycutt testified that, following the appropriation, Atrium Two would suffer a loss of $6.5 million based on a decrease in rent charged and/or increased vacancy. Honeycutt further opined that restoring a southern access point to Atrium Two would cost an additional $3.5 million. But Honeycutt clarified that access could not be restored without acquiring property not currently owned by OTR. In summary, Honeycutt determined that Atrium Two had suffered a loss in value of $10 million following the appropriation.
 {¶ 59} The city and county presented valuation testimony from two witnesses. Shaun Wilkins, a commercial-real-estate appraiser, used the income approach to determine loss in value. Wilkins utilized Atrium Two's rent rolls, which contained a list of tenants, the amount of space a particular tenant occupied, the rent paid, and the expiration date of the tenant's lease. He additionally reviewed internal appraisals conducted by OTR. Wilkins concluded that Atrium Two's net income had increased each year since the appropriation. But Wilkins determined that the closure of the walkway had affected the retail traffic's access to Atrium Two. Accordingly, the retail space would need to be converted into office space to maintain the highest and best use of the building. Based on the rent rolls, Wilkins concluded that the rent charged for retail and office space was similar, and that the only cost to be incurred was that associated with the physical conversion of retail space into office space. Wilkins opined that such a conversion would cost $160,000.
 {¶ 60} Commercial real estate appraiser Neil Notestine was the last witness to provide valuation testimony. Notestine employed the income approach using a discounted-cash-flow method. He concluded that the value of Atrium Two before the appropriation was $79,750,000. Notestine determined that after the appropriation, *Page 19 
Atrium Two's rental rate had not changed and its occupancy had gone up. But Notestine further determined that portions of the first and second floors needed to be converted into office space, and that the plaza needed repairs where the walkway had been connected. Following these conversions and renovations, Notestine found the value of Atrium Two to be $79,570,000, for a loss in value of $180,000.
 {¶ 61} The jury's award of $1 million for damages to the building was well within the range of damages testified to at trial and was supported by competent, credible evidence.
 {¶ 62} The city and county argue that the only time the specific amount of $1 million had been presented during trial was Jackson's estimate of the cost to cure the loss of southern access. As a result, they allege that the jury must have become confused and inserted the amount of the cost to cure the problem in the space provided for damages to the building. We disagree. As we have stated, $1 million was well within the range of damages testified to. And we do not know what factors or testimony the jury relied upon in determining damages. We note that both the award of $1 million for damage to the building and the overall award of $3.5 million were less than amounts provided by each of OTR's witnesses.
 {¶ 63} Because the jury's award of damages was supported by competent, credible evidence, we overrule the fourth assignment of error.[16]
 "Cost of Cure" {¶ 64} In their fifth assignment of error, the city and county argue that the trial court erred in not reducing the jury's award of damages to the "cost of cure," which is the cost to restore the building's fair-market value.[17] They argue that when a *Page 20 
"cost of cure" has been established, the award of damages must be limited to such an amount.
 {¶ 65} The jury was given the following instruction regarding the "cost of cure": "If, by the expenditure of money in an amount less than the difference between the fair market value of the building before the taking and the fair market value of the building after the taking, the property owner can make improvements to the building to restore its fair market value, such cost of cure, if proved, limits the amount of damages to be assessed. However, such cost of cure may not be used to reduce the damages where the cure must be accomplished by going outside or beyond the Atrium [Two's] property."
 {¶ 66} In the case sub judice, the "cost of cure" was the cost to restore access from the 530-foot elevation of Atrium Two to the public right of way. Limited testimony was given regarding the "cost of cure." Raymond Jackson testified that it would cost $1 million to secure such access. And Todd Honeycutt testified that a southern access would cost $3.5 million. But both Jackson and Honeycutt stated that the restoration of access could not be accomplished without the purchase of additional property.
 {¶ 67} Accordingly, because the "cost of cure" could not be established without going outside of Atrium Two's property, it could not be used to reduce the award of damages.
 {¶ 68} The fifth assignment of error is overruled.
 OTR's Cross-Appeal {¶ 69} OTR has filed a cross-appeal raising two assignments of error. But the cross-appeal was solely filed to preserve OTR's claims of error should this court sustain the city and county's arguments and remand for a new trial. OTR has *Page 21 
requested that we refrain from addressing its assignments of error if we find no merit in any assignments raised in the city and county's appeal.
 {¶ 70} Because we have, in fact, found no merit in the arguments raised by the city and county, we will not address the arguments raised in OTR's cross-appeal.
 {¶ 71} Consequently, we affirm the jury's award of damages in the amount of $3.5 million.
Judgment affirmed.
PAINTER, P.J., and HILDEBRANDT, J., concur.
[1] OTR v. Cincinnati, 1st Dist. No. C-010658, 2003-Ohio-1549.
[2] Id. at ¶ 50.
[3] Id. at ¶ 53.
[4] 4th Dist. No. 03CA33, 2004-Ohio-7281.
[5] Id. at ¶ 22.
[6] Id.
[7] See In Re Appropriation for Hwy. Purposes of Lands ofWilliams (1968), 15 Ohio App.2d 139, 239 N.E.2d 412. See, also, State exrel. Merritt v. Linzell (1955), 163 Ohio St. 97, 126 N.E.2d 53.
[8] OTR v. Cincinnati, supra, at ¶ 50.
[9] Hilliard v. First Indus., L.P., 165 Ohio App.3d 335,2005-Ohio-6469, 846 N.E.2d 559, at ¶ 26.
[10] Norwood v. Forest Converting Co. (1984), 16 Ohio App.3d 411, 415,476 N.E.2d 695, quoting In Re Appropriation for Hwy. Purposes of Land ofWinkelman (1968), 13 Ohio App.2d 125, 138, 234 N.E.2d 514.
[11] Bernal v. Lindholm (1999), 133 Ohio App.3d 163, 176,727 N.E.2d 145.
[12] Lester v. Leuck (1943), 142 Ohio St. 91, 50 N.E.2d 145, paragraph one of the syllabus; accord Hal Artz Lincoln-Mercury, Inc. v. Ford MotorCo., Lincoln-Mercury Div. (1986), 28 Ohio St. 3d 20, 28,502 N.E.2d 590.
[13] See Brooks v. Bell (Apr. 10, 1998), 1st Dist. No. C-970548.
[14] See Richley v. Jones (1974), 38 Ohio St. 2d 64, 68-69,310 N.E. 2d 236. See, also, Ohio Jury Instr. 301.09(4).
[15] See Murphy v. Carrollton Mfg. Co. (1990), 61 Ohio St.3d 585, 591,575 N.E.2d 828.
[16] See Hilliard v. First Indus., L.P., supra, at ¶ 30.
[17] The "cost of cure" to restore the building's fair-market value is distinguishable from the "cost to cure" discussed in the second assignment of error, which concerned the cost to secure additional parking for Atrium Two. *Page 1