[Cite as *Dept. of Natural Resources v. Ebbing*, 2015-Ohio-471.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### MERCER COUNTY

STATE OF OHIO, DEPARTMENT OF
NATURAL RESOURCES,

      **PLAINTIFF-APPELLANT,**           CASE NO. 10-13-24

      v.

STANLEY EBBING, ET AL.,               O P I N I O N

      **DEFENDANTS-APPELLEES.**

Appeal from Mercer County Common Pleas Court
Trial Court No. 12-CIV-145

Judgment Reversed and Cause Remanded

Date of Decision: February 9, 2015

APPEARANCES:

    *Scott D. Phillips and Frank J. Reed, Jr.* for Appellant

    *Bruce L. Ingram and Thomas H. Fusonie* for Appellees

Case No. 10-13-24

**ROGERS, P.J.**

{¶1} Plaintiff-Appellant, the State of Ohio, Department of Natural Resources ("ODNR"), appeals the judgment of the Court of Common Pleas of Mercer County entering a jury verdict in favor of Defendants-Appellees, Stanley ("Stanley") and Vicki ("Vicki") Ebbing (collectively "the Ebbings") in an amount of $764,518 in compensation for ODNR taking a permanent flowage easement on the Ebbings' property. On appeal, ODNR argues that the trial court erred by: (1) denying its request for a jury view; (2) admitting certain exhibits and testimony proffered by the Ebbings while excluding certain evidence proffered by ODNR; and (3) providing prejudicial jury instructions. For the reasons that follow, we reverse the trial court's judgment.

{¶2} This matter concerns Grand Lake Saint Marys ("GLSM"), a man-made lake located in Mercer and Auglaize Counties. Sometime in 1978, an inspection revealed "that the western spillway at GLSM could not pass a probable maximum flood[1] without overtopping for 48 hours, which would result in the eventual failure of the dam and catastrophic flooding." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 5. As a result, in 1990, ODNR decided to replace GLSM's 39.4-foot spillway with a 500-foot spillway in order to

---

[1] "A 'probable maximum flood' has been described as the flood caused by runoff from a probable maximum precipitation." *Doner* at fn. 2.

pass the probable-maximum-flood test. *Id.* at ¶ 6. The construction of the new spillway began in 1996 and was completed in 1997. *Id.* Both public officials and private citizens expressed concerns to ODNR about the new spillway and the possibility of greater flooding downstream along Beaver Creek. *Id.* at ¶ 8.

{¶3} By July of 2009, relators, a group of 87 landowners, filed an action for a writ of mandamus in the Supreme Court of Ohio to compel ODNR "to initiate appropriation proceedings for the taking of their property." *Id*. at ¶ 86. The Ebbings were one of these landowners. The relators alleged that ODNR's 1997 replacement spillway flooded their properties resulting in damage to their land and crops. *Id.* at ¶ 17. The Court determined that the "flooding that occurred on [the relators'] property was the direct, natural, or probable result" of the 1997 spillway. *Id.* at ¶ 79. Further, the Court found that the relators "established by the requisite clear and convincing evidence that the flooding of their property, while intermittent, is inevitably recurring." *Id.* at ¶ 82. The Court compelled ODNR to initiate appropriation proceedings to determine the amount and extent of the taking of the property. *Id.* at ¶ 86.

{¶4} On August 9, 2012, ODNR initiated appropriation proceedings for a flowage easement on the Ebbings' properties. ODNR filed a petition to appropriate a flowage easement and to fix compensation wherein it argued that the fair market value of the Ebbings' property was $492,000. ODNR listed the

Ebbings as defendants, as well the Mercer County Auditor and Treasurer. On August 17, 2012, the Mercer County Auditor and Treasurer filed their Answer, stating that they had the first and best lien. On September 10, 2012, the Ebbings filed their Answer.

{¶5} While this matter implicates over a year's worth of discovery, and numerous motions and depositions, we will only discuss the evidence that is relevant to this appeal. Accordingly, for purposes of this appeal, this matter has four relevant stages: (1) ODNR's request for a jury view; (2) the Ebbings' motion to exclude ODNR's witnesses and photographs; (3) ODNR's motions to exclude the testimony, report, and photographs of the Ebbings' expert; and (4) the jury trial. We address each stage in sequence below.

*Request for a Jury View*

{¶6} On June 27, 2013, ODNR filed a request for a jury view. In its request, ODNR argued that "the jury should be provided an opportunity to observe the [Ebbings'] property in light of the evidence [the Ebbings] intend to introduce. Moreover, the jury should be permitted to view the property relative to its location and distance from the spillway, Beaver Creek, and the Wabash River." (Docket No. 86, p. 2).

{¶7} The Ebbings filed a memorandum in opposition to ODNR's request for a jury view on July 11, 2013. In its memorandum, the Ebbings argued that

ODNR's request for a jury view was "calculated merely to prejudice the Ebbings." (Docket No. 89, p. 2). Further, the Ebbings argued that because they were "limited to presenting evidence of the property when it is flooded through testimony, pictures and videos, ODNR should be under the same limitation * * * so as to prevent ODNR from showing 'the property in an unfair light.' " (*Id.* at 3), quoting *Proctor v. Wolber*, 3d Dist. Hancock No. 5-01-38, 2002-Ohio-2593, ¶ 57. They also asserted that there would be no complex or unclear evidence at trial, making a jury view unnecessary.

{¶8} On August 26, 2013, the trial court denied ODNR's request for a jury view. In its ruling,[2] the trial court stated that it was "not mandated to grant a party's request for a jury view prior to the commencement of a jury trial." (Docket No. 125). Further, the trial court stated that it believed that the jury would have difficulty separating what they saw in a jury view and the evidence that would be admitted at trial. (*Id.*).

*Motion to Exclude ODNR's Witnesses & Photographs*

{¶9} On August 9, 2013, the Ebbings filed a motion in limine to exclude Bryon Frank and Bryan Smith as witnesses for ODNR and also to exclude

---

[2] The trial court improperly captioned its ruling as a "judgment entry." A judgment entry is by definition a final order subject to appeal (a final appealable order). Civ.R. 54(A); *see also Black's Law Dictionary* 970 (10th Ed.2014) (defining "judgment" as a "court's final determination of the rights and obligations of the parties in a case * * * and any order from which an appeal lies"). Because the trial court's entry was merely an interlocutory order, it was not a judgment entry.

evidence of the January 2013 flood. In their motion, the Ebbings asserted that ODNR was attempting to re-litigate the issue of causation of the flooding on the Ebbings' farms through the "misleading, confusing, and incompetent testimony of ODNR employees, Bryon Frank and Bryan Smith." (Docket No. 96, p. 1). While ODNR claimed that Frank would only be called to authenticate photographs of a flood event in January of 2013, the Ebbings believed that Frank would also attempt to testify that flooding on the Ebbings' farms in 2013 was not caused the spillway. The Ebbings similarly anticipated that Smith, a surveyor for ODNR, would testify that that the 2013 flooding on the Ebbings' farms was not caused by the spillway.

{¶10} That same day, the Ebbings filed a separate motion to exclude Glen Cobb as a witness for ODNR. According to the Ebbings, ODNR wanted to use Cobb in order to present testimony on GLSM's practices on lake-level management. The Ebbings argued that ODNR was simply trying to re-litigate the issue of causation, which was settled by the Court's decision in *Doner*.

{¶11} On August 16, 2013, ODNR filed a memorandum in opposition to the Ebbings' motion to exclude the testimony of Cobb and other evidence of the resumption of lake level management by ODNR. ODNR argued that the fact that ODNR resumed its lake-level management practices at GLSM was relevant to determine the "extent" of the take. Further, ODNR maintained that it was relevant

as to the issue of future flooding. In a separate memorandum in opposition, filed that same day, ODNR also argued that the trial court should deny the Ebbings' motion to exclude Frank's and Smith's testimony and evidence of the January 2013 flood. In its motion, ODNR reiterated many of the same arguments made in its memorandum in opposition to exclude Cobb's testimony. It also stated that the Ebbings would seek to introduce multiple photographs taken in January, April, and May of 2013. Thus, "[f]airness dictates that ODNR should also be able to introduce evidence from the flood event that occurred in January, 2013." (Docket No. 104, p. 5-6).

{¶12} On August 26, 2013, the trial court granted the Ebbings' motion to exclude evidence from Frank and Smith[3]. The trial court stated that any evidence regarding the flooding in January of 2013 is "irrelevant and inadmissible, unless it is established to be relevant to the valuation of plaintiff's permanent flowage easement taken over Ebbings [sic] properties." (Docket No. 127, p. 1). That same day, the trial court also granted the Ebbings' second motion to exclude Cobb's testimony as to the ODNR's lake level management practices at GLSM. The trial court stated that what ODNR has done "or will do in the future to minimize its use

---

[3] We note that in the trial court's decision filed on August 26, 2013, it used the last name of "Miller" for Bryan. However, both ODNR and the Ebbings use the last name of "Smith." We will assume the trial court made a clerical error in writing his decision.

of the permanent flowage easement is not relevant to the valuation of the permanent flowage easement * * *." (Docket No. 135, p. 1).

*Motion to Exclude Vannatta's Expert Testimony,
Report, & Photographs*

{¶13} On August 14, 2013, ODNR filed a motion to exclude the testimony and report of the Ebbings' expert witness, Richard Vannatta. Generally, ODNR argued that Vannatta "clearly manipulates certain variables to arrive at artificially inflated pre-appropriation values, and artificially deflates post-appropriation values for the [Ebbings'] property." (Docket No. 102, p. 3-4). Specifically, ODNR raised three issues with Vannatta's report. First, ODNR argued that Vannatta erroneously supposed that the Ebbings' property experienced no flooding prior to 1997 when calculating the pre-appropriation value, despite admitting knowledge of such flooding in his deposition. Second, ODNR believed that Vannatta had deflated post-appropriation values by increasing the geographic scope of the take, without possessing the necessary expertise to make such a determination. Lastly, ODNR argued that Vannatta used diminished crop yields in the valuation of the damage to the residual estate. ODNR asserted that under Ohio law, profits from businesses conducted on real property could not be utilized in appropriation proceedings because business profits are too speculative.

{¶14} On August 16, 2013, ODNR filed a motion to exclude reference to photographs contained in Vannatta's appraisal report. ODNR objected to the

images on pages 35, 36, 37, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, and 56. In total, ODNR had issue with 25 images in Vannatta's report. In its motion, ODNR argued that most of the photographs displayed in Vannatta's appraisal report displayed flooding on locations that were not on or near the Ebbings' properties. ODNR also specifically objected to the inclusion of one image which showed the "emotionally-charged story of [a] near-drowning girl" that did not take place on or near the Ebbings' properties. (Docket No. 112, p. 3).

{¶15} On August 20, 2013, the Ebbings filed a memorandum in opposition to ODNR's motion to exclude Vannatta's testimony and appraisal report. The Ebbings stated that Vannatta's report did account for the 1% annual chance of flooding in pre-appropriation values. Further, in regard to ODNR's argument that Vannatta improperly expanded the scope of the taking, the Ebbings argued he was only "discussing what market participants would consider in determining what to pay for the farmland in the after." (Docket No. 114, p. 2). Lastly, the Ebbings argued that Vannatta did not include speculative business losses into its post-appropriation values, but only considered what a reasonable market participant would consider in valuing the residual land.

{¶16} On August 22, 2013, the Ebbings filed a memorandum in opposition to ODNR's motion to exclude certain photographs in Vannatta's report. The Ebbings asserted that all photographs contained in Vannatta's report were relevant

because they depict the negative external influences of the take. These negative external influences will affect the post-appropriation value of the Ebbings' two farms. Therefore, the Ebbings asserted that all photographs located in Vannatta's report were relevant and not overly prejudicial to ODNR.

{¶17} On August 26, 2013, the trial court denied ODNR's motion to exclude Vannatta's expert testimony and appraisal report. In its ruling, the trial court stated that ODNR's motion "raises issues of credibility and weight * * * but does not raise any issues of admissibility." (Docket No. 123, p. 1). That same day, the trial court also denied ODNR's motion to exclude photographs located in Vannatta's appraisal report. (Docket No. 129, p. 1-2).

*Trial Proceedings*

{¶18} The trial of this matter commenced on August 28, 2013, and ended on August 30, 2013. Before voir dire began, both parties met in the trial judge's chambers to discuss preliminary issues. The trial court again denied ODNR's request to proffer Frank and Smith as witnesses and ruled that testimony concerning lake level management was irrelevant. Trial Tr., p. 7. Further, in regard to jury instructions, ODNR objected to the use of the term "frequently, severely, and persistently" to describe the flooding. *Id.* at 10. ODNR believed the phrase "inevitably recurring and intermittent" would be more accurate. *Id.* The Ebbings argued that in order to establish a taking, relators must have established

that the flooding was frequent, severe, and persistent, and were thus appropriate. The Ebbings also noted that ODNR had not objected to the use of "frequent, severe, and persistent" in a separate appropriations proceeding. The trial court ultimately denied ODNR's request to delete the words "frequent, severe, and persistent" from the jury instructions.

{¶19} The first witness for the Ebbings was Stanley Ebbing. Stanley testified that he has lived in Mercer County all of his life, is a third generation farmer, and owns several farms in Mercer County. Specifically, Stanley testified that he owns two farms along Beaver Creek: Ebbing West Farm and Ebbing East Farm. These two farms are approximately a mile-and-a-half away from each other. Ebbing West Farm is located off of Gause Road and is approximately 58 acres. Ebbing East Farm is located off of Monore Road and is 68 acres.

{¶20} Stanley testified that he bought Ebbing East Farm in late 2008. This was the first time that Stanley had farmed along Beaver Creek. According to Stanley, he decided to buy Ebbing East Farm because the property "was up for sale, and it was close to our other farms that we could get to it to farm it." *Id.* at 103. Before buying Ebbing East Farm, Stanley talked with the previous owner. When asked whether he was aware of any flooding on Ebbing East Farm, Stanley replied, "I thought possibly in 2003 and 2005, why with them that [sic] everybody said was historical floods, I thought possibly it could have been flooded then." *Id.*

at 104.  Further, Stanley testified that he was unaware as to whether ODNR was responsible for any of the flooding and that "[i]f they were, why you'd have thought they'd have fixed it, you know, if there was any problem." *Id.*

{¶21} Stanley bought Ebbing West Farm in January of 2009.    Stanley testified that he bought this farm because his "son wanted to buy or take over [Stanley's] dairy farm at Coldwater.  So we went into the accountant and he said if you do a land trade, it would be simple to do.  So we bought that and then my son bought it and did -- we did a land trade." *Id.* at 105.  Stanley was not old enough to retire and still wanted to farm, which is why he thought buying Ebbing East and Ebbing West would be a good idea.  Stanley testified that he was unaware of any prior flooding of Ebbing West, except for maybe in 2003 or 2005.

{¶22} The Ebbing West Farm was bought at a public auction for $4,100 dollars an acre for a total price of $237,800.  Stanley bought Ebbing East Farm for $7,150 dollars an acre for a total price of $486,200.  Stanley testified that he was "surprised" that Ebbing West Farm sold for such a low price and was expecting to pay a similar price for Ebbing West Farm and Ebbing East Farm. *Id.* at 106.

{¶23} Stanley was then shown Exhibit D, a picture of the spillway in 2011 during a flooding event.  ODNR objected to Exhibit D and had the following relevant exchange:

> ODNR:  Your Honor, at this time we'd object to Exhibit D for the same reasons that we've talked about in pretrial.  We do not think

that there is any authenticity to Exhibit D. We do not think it's relevant for the jury to see a picture that occurred in 2011 of the spillway, but rather the issue should be what the Ebbing farm looks like for these proceedings.

\* \* \*

The Ebbings: Your Honor, to respond to that, the spillway and the 500 feet of rushing water that come out of that spillway rushing down the Beaver Creek to the landowners' property is showing the effects of the take. This is an instance in which ODNR in use of its flowage easement it has here is showing the effects of the take, an example of the effects of the take to the landowners' property. If, your Honor, wants me to get into the Supreme Court decision that established ODNR's flooding from the spillway the landowners' property and this is part of the Supreme Court case, I'm happy to go into that.

Trial Court: It's not necessary. For the limited purpose of identifying the incident from which we're basing this easement and valuation thereof, we are allowing limited number of photographs to so indicate. And for that purpose, I will let that in and overrule the objection. You may proceed.

*Id.* at 108-109.

{¶24} Stanley testified that his farms are downstream of the spillway. Stanley also testified that, since buying both properties, his farms have continuously flooded in 2009, 2010, 2011, and 2013. Stanley stated that the flooding will usually last a week to two weeks, with flood-waters up to four to ten feet deep. As a result of the flooding, Stanley testified that the farms have experienced tile blowouts, bank erosion, soil erosion, soil compaction, and heavy debris washing up on his farms, which can result in delayed planting. Stanley

specified that he has had spare tires, tree limbs, cans, bottles, a chemical drum, and a child's playground slide, cast upon his property as a result of the flooding.

{¶25} Stanley also identified Exhibit L, a picture of the spillway that was taken in April of 2013.  ODNR objected to Exhibit L but the trial court ultimately overruled ODNR's objection.

{¶26} Stanley testified that ODNR is taking a permanent flowage easement across 32.07 acres of his Ebbing West Farm and 18.96 acres on Ebbing East Farm. Stanley stated that flooding also impacts the land that is outside of the flowage easement. Stanley then had the following exchange:

> Q:  Now, in your opinion, Mr. Ebbing, as the owner of these two farms, will the value of your farms be damaged by ODNR taking its permanent flowage easement?
>
> A:  Yes, sir.
>
> Q:  Has an appraisal been done of the damage ODNR's permanent easement will cause to your farms?
>
> A:  Yes, it has.
>
> * * *
>
> Q:  If you could turn to Exhibit Y in the book, sir.  I'm showing you what's been market as Exhibit Y.  Can you identify Exhibit Y for the jury?
>
> A:  Yes, sir.  That's Mr. Vannatta's appraisal.
>
> Q:  Have you read Mr. Vannatta's appraisal?
>
> A:  Yes, I have.

Q: Are you aware that he values your farms before ODNR's permanent easement at $1,720,000?

A: Yes, I do.

Q: Do you agree with that?

A: Yes, I do.

Q: Are you aware that Mr. Vannatta values your farms after ODNR's permanent easement at $574,500?

A: Yes, I do.

Q: Do you agree with that?

A: Yes, I do.

*Id.* at 142-143.

{¶27} On cross-examination, Stanley admitted that he has a residence on State Route 219; he also owns 160 acres on Township Line; 38 acres on Burkettsville Saint Henry; 78 acres on Kuhn Road; a rental property on Shore Drive; a vacant lot on Marco Island; and at one point owned 80 acres at 3613 State Route 219. *Id.* at 146-148.

{¶28} Stanley also testified that he is part of the *Doner* lawsuit, which was filed on July 17, 2009. Stanley stated that he purchased Ebbing West Farm on January 30, 2009 about six months before he became a part of the *Doner* lawsuit. Prior to purchasing Ebbing West Farm, Stanley stated that he drove by the property. Stanley also testified that he drove by the general area in 2003 and in

2005 to observe the massive flooding that had occurred, but could not recall if he specifically observed the massive flooding on Ebbing West Farm. Stanley never asked whether the property was in the 100-year floodplain, because he did not believe that it was important. Stanley also admitted that he did little research prior to buying Ebbing West Farm:

> Q: All right. And I think we've already established you drove by the 58-acre farm before you bought it; is that right?
>
> A: That's correct.
>
> Q: But you didn't get out and walk the property, did you?
>
> A: No, sir.
>
> Q: And the person who farmed that property was Mark Siefring at the time?
>
> A: Yes, sir.
>
> Q: All right. And did you talk to Mr. Siefring prior to buying the 58-acre farm?
>
> A: No, sir, I didn't.
>
> Q: Did you investigate what soil it had?
>
> A: No, sir, I didn't.
>
> Q: Did you investigate what field tile, if any, it had and the condition of that tile?
>
> A: No, sir, I didn't.
>
> Q: Did you investigate what kind of crop yields it had?

A: No, sir, I didn't.

*Id.* at 158-159.

**{¶29}** Further, Stanley could not say what kind of crop yield he had for Ebbing West Farm in 2012. That was because the Ebbings "take all the corn from all the farms and * * * we have a couple big bins and we dump it in and try to get it over with as fast as we can, and we don't keep records of what comes off what farm." *Id.* at 159. Stanley stated that he does not have a crop yield for 2011 either, because of the same reason. Stanley stated that when he went to seed Ebbing East and West in 2013, there was no water on the ground.

**{¶30}** On re-direct, Stanley stated that he was asked to join the *Doner* lawsuit and did not actively seek out involvement with the lawsuit.

**{¶31}** The Ebbings' next witness was Stephen Zumberge, who owns a farm that abuts the Ebbing East Farm. He testified that he frequently drives by Ebbing West Farm to get to his farm off of Bunker Hill Road. Zumberge bought this farm in 1990 and testified that he has observed flooding on the Ebbing West Farm. The first time he observed such flooding was in August of 1998. Zumberge then stated that he saw the new spillway in August of 1998 and witnessed the spillway overtopping. According to Zumberge, there were crops in the ground while it was flooding, the flooding lasted for several days, and when the water receded, some of the crops were dead while others were damaged. Zumberge testified that

Ebbing West Farm flooded "most years since [August 1998] at one time or another during the year." *Id.* at 182.

{¶32} Zumberge also observed flooding on Ebbing East Farm in 1998. Like Ebbing West Farm, he observed that after the water receded, many of the crops were dead or damaged from the water. Again, he stated that the flooding on Ebbing East would last a few days, and has happened "most years since '98." *Id.* at 188.

{¶33} In the 15 years before the new spillway was built, Zumberge testified that there was minimal flooding along the Beaver Creek. Since the new spillway, Zumberge has seen the first five roads west of the spillway flooded at least four times. Further, Zumberge testified that the Ebbing East Farm is located in between two of those roads. Zumberge authenticated numerous photographs that he took of the spillway and surrounding area in 2003 and 2005.[4]

---

[4] We note that on cross-examination of Zumberge, ODNR objected to the 2003 and 2005 pictures of the spillway arguing that the Ebbings did not own either Ebbing West or East Farms during these dates, and thus the pictures were irrelevant. ODNR stated that the reason they did not object to the exhibits while Zumberge was on direct examination was because it was "careful not to interrupt counsel for the landowners because of the court's prior rulings." Trial Tr., p. 193. Further, counsel for ODNR stated, "I just want to make clear that [ODNR] believes that those exhibits should not come into evidence and the jury should be given instructions to disregard them because it does not go to the fair market value * * *." *Id*. The trial court ruled that if the photographs were not connected to "any kind of valuation by any of the expert witnesses that are going to testify and if there's no other purpose in the exhibits being proffered as evidence, they won't be. But they have been properly authenticated for purposes of admission should they be found relevant by the court." *Id.* The trial court later admitted these pictures into evidence after the Ebbings' rested their case.

{¶34} On cross-examination, Zumberge admitted that he is part of the John H. and Virginia Zumberge Trust, which is a party to the *Doner* lawsuit. In addition to the *Doner* lawsuit, Zumberge filed a separate lawsuit against ODNR. Zumberge's father, John Zumberge, also filed a lawsuit against ODNR. However, Zumberge denied having an "actual bias" against ODNR. *Id.* at 192.

{¶35} Richard Vannatta, a real estate broker and appraiser, was the next witness to testify for the Ebbings. Vannatta was offered and accepted as an expert witness without any objection from ODNR. Vannatta was asked to render an expert opinion on the valuation of the Ebbings' two farms. Vannatta explained that ODNR is taking an "occupancy right" from the Ebbings, which gives it the right "to flood the property at any given time, 24/7, forever." *Id.* at 214. Further, he stated that the Ebbings must deliver the easement to ODNR free and clear of all encumbrances. Vannatta thought that this was significant in his valuations because "they have to pay it off first of all, then if they were to want to sell it or refinance it for whatever reason, my understanding [is] they can't encumber that easement." *Id.* at 214-215. Vannatta also stated that this would be important to an informed, willing buyer.

{¶36} Vannatta testified that Ebbing East Farm contains 68 acres, is generally level, has no woodlands or waterways on it, and is about 99 percent tillable. He stated that Ebbing West Farm contains the confluence of the Little

Beaver Creek and Beaver Creek and that Ebbing West Farm is also generally level and mostly tillable.

{¶37} Vannatta testified that the "highest and best use" for the two farms would be farm use. According to Vannatta, he has seen farmland in Mercer County appreciate as high as 18 percent within the last couple of years. Vannatta also explained that when he valued the two properties, he valued them together because of the concept of "larger parcel."[5] *Id.* at 219.

{¶38} Vannatta then explained how he came to determine the amount of compensation that is due when the government involuntarily takes a landowner's interest in a piece of property:

> We first -- condemnation, unless it's a total taking where they take the whole property, it's two appraisals. You appraise the property, what we call in the before instance, before any of -- whatever -- if they're building a road, before they built the road; if they build a dam, before they built the dam. So I'm thinking back to 1997 before anything happened, as if that property was undisturbed back in 1997, but on today's values, not 1997, trying to assume what that property was like.
> Then now today, effective today for our purposes, I assume all the project is done and that means assuming all damages, the area that they take is correct and that what we call the project has been

---

[5] "Larger parcel" is defined as:

> A portion of land that is not a complete parcel, but is the greater part of a bigger tract, entitling the owner to damages both for the parcel taken and for its severance from the larger tract. To grant both kinds of damages, a court generally requires the owner to show unity of ownership, unity of use, and contiguity of the land. But some states and the federal courts do not require contiguity when there is strong evidence of unity of use.

*Black's Law Dictionary* 1013 (10th Ed.2014).

completed. So you have a before value and an after value considering all the negative effects that occurred to the property.

*Id.* at 220-221. The just compensation[6] owed to the Ebbings is the difference between the before value and the after value.

**{¶39}** Vannatta stated that the flowage easement is approximately 40% of the two farms and listed some of the negative effects the flowage easement has had, and will continue to have, on the residue:

You can have a tile blowout, and the inverse is you can have sinkholes because of tile blowouts. Then you have this sucking down in; you have sinkholes; you have saturation. There you can see stubbles of crop maybe. So you can lose crops or delayed planting seasons. You can have to replant because the crops, you know, got waterlogged, rotted out or something so there's -- then there's accumulation of trash that comes on [the] property. Some are suffering silt buildup, gravel, and then trees and different things as the water's coming down because it's jumping so far out of its banks that it's dragging all kinds of stuff with it and it gets deposited who knows where along different properties.

*Id.* at 224. Vannatta testified that these are all factors that an informed, willing buyer would consider when looking at the Ebbings' properties after the flowage easement was imposed. Vannatta also stated that the flowage easement created negative effects to the areas surrounding the Ebbings' properties such as road

---

[6] Vannatta explained that "just compensation" encompasses both the compensation owed to the property owner for the taking and the compensation owed for damages to the residue. Trial Tr., p. 221.

closures. Vannatta included numerous pictures of the different road closures in his report.[7]

**{¶40}** When talking about the different external effects the flowage easement created, Vannatta had the following relevant exchange:

Q: Are there other considerations about not being able to get to your property or others not being able to get to your property a willing buyer would consider?

A: Yes, sir.

Q: Such as what?

A: I know for example early on I was working with Mr. Post who's now diseased [sic]. But he and his wife both were advanced age but had had a number of health issues and their son was there. And at times they were concerned if either one got sick that EMS couldn't get there.

ODNR: Objection, your Honor.[8] May I approach?

(The following proceedings were had at the bench by the court and counsel out of the hearing of the jury:)

ODNR: Objection as to Mr. Post's health being relevant to the facts.

The Ebbings: I'm sorry. He was simply giving an example an informed, willing buyer would have.

---

[7] ODNR explicitly objected to these pictures at trial as irrelevant. Trial Tr., p. 225. However, the Ebbings argued that it was relevant to show the negative external factors the flowage easement has on the property, that these negative external factors would be considered by an informed, willing buyer, and that Vannatta had relied on these factors in determining his valuation. The trial court agreed with the Ebbings and overruled ODNR's objections.

[8] ODNR does not assign this specific ruling as error in its appeal.

Trial Court: Objection is overruled.

*Id.* at 227-228.

{¶41} Vannatta also talked about images located on pages 48 and 49 of his report that depicted a young woman who almost drowned in her car. While ODNR had objected to these pictures in a pretrial motion, it failed to renew the objection at trial. Vannatta explained that "overtopping, hydroplaning, fears, danger of trying to get to your property or maybe not being able to get to it at all" are all external factors that an informed, willing buyer would consider. *Id.* at 229.

{¶42} After taking all of these external factors into consideration Vannatta valued the Ebbings' properties before the take at $1,720,000, the after value of the Ebbings' properties at only $574,540, and the difference between the before and after being $1,145,000. Of the $1,145,000 the Ebbings were asking for, $626,000 was for the taking of the flowage easement and $519,500 was for the damage to the residual area outside of the take area.

{¶43} On cross-examination Vannatta admitted that he has been hired by the Ebbings' law firm to provide appraisals on a number of other similar cases in Mercer County. He was paid $9,000 to prepare the report for the Ebbings. In about 99 percent of the appraisals he has conducted he testified for the landowners.

{¶44} ODNR then asked Vannatta about a statement he made in his report:

Q: Okay. Turning to page 2 of Defendant's Exhibit Y you state this paragraph: In the before I necessarily suppose that the new spillway improvements are yet to be accomplished. No trespass or encroachments have occurred and the whole of the study farms is yet to be inundated or damaged. Isn't it true that the property flooded and damage occurred prior to the spillway improvements?

A: I don't know that -- it flooded on the 1 percent chance of annual flooding which is nothing near what -- I never denied it never flooded. We know that it's in the hundred-year floodplain. Now we're talking about the spillway. Two different things.

Q: Mr. Vannatta, that's not responsive to my question. In that paragraph you say: I supposed that the study farms is [sic] yet to be inundated or damaged. So in your before valuation, aren't you supposing that no flooding occurred prior to '97?

A: No, I am not because I think I explained earlier that I looked back to '97, considering what the type of flooding and things that were happening in my valuation. I'm looking back there to try to do -- that's why it's hypothetical back there, the general condition of that property and the effects that were going on back then.

Q: Okay. So did you meet with any hydrologist or engineers to determine how much the property flooded prior to the redesigned spillway?

A: No.

Q: Okay. Did you review flood data relative to 1993?

A: I saw some on the maps. They're hard to get off the Internet. It's hard to find.

*Id.* at 254-255.

{¶45} Vannatta also admitted that he did not know, and he did not consider,

the purchase price the Ebbings paid for the two farms in 2008. Vannatta also

acknowledged that although the average price of farmland in the State of Ohio is $5,000 per acre, he still valued the Ebbings' property at $14,000 per acre before the taking. After the taking, Vannatta valued the encumbered part of the land at $1,400 per acre and the unencumbered portion at $7,000.

{¶46} Vannatta stated that to his knowledge, the Ebbings have never lost a planting season due to the flooding. Further, in his report, Vannatta stated that he believed the flooding would likely creep over time beyond the defined easement. However, Vannatta conceded that he did not meet with a hydrologist to discuss the science behind the "creep" he described in the report.

{¶47} After Vannatta's testimony, the Ebbings then sought to admit Exhibits A through GG. ODNR objected to the admission of Exhibits D, E, K, L, M, P, Q, W, Z, AA, BB, CC, DD, and GG. The trial court overruled all of ODNR's objections and admitted all of the Ebbings' Exhibits into evidence. The Ebbings then rested but notified the court that it would be objecting to ODNR's first witness, Glen Cobb. According to the Ebbings, ODNR would "attempt to try to ask Mr. Cobb questions related to the background of the dam" and did not believe that it was relevant testimony. The trial court, ODNR, and the Ebbings, then had the following relevant exchange:

> ODNR: Judge, I have a suggestion. I'd like to try to be cooperative in this regard because I don't want this to be prolonged. What I propose is that I simply ask Mr. Cobb a few questions about who he is, his position with the Department, whether he was the manager of

the park lake, whether he saw flooding prior to 1997 without any other, you know, that's an easy question, and whether he saw any flooding after 1997. And that would be the extent of our testimony.

* * *

Trial Court: This court will allow Mr. Cobb's testimony about who he is, his position with the Ohio Department of Natural Resources back prior to the construction of the new spillway, his observations of what flooding he may have observed to this property and others downstream, and whether he can testify as to the subsequent flooding afterwards because those go to the issue of the value and the fact that before the take there was flooding, which is consistent with some of the testimony that's already been made. But beyond that, I don't know that Mr. Cobb has anything that the court would deem relevant and certainly not about the necessity of the take.

* * *

The Ebbings: Your Honor, I understand you've made a ruling. If I could ask for some reconsideration only in light of something I'm going to provide that I specifically asked Mr. Cobb in his deposition just a few weeks ago.

"At this time here today, do you have any specific factual information about the Ebbing properties?" And the answer was no. So I don't see how his testimony is relevant to the Ebbing properties involved in this case here today.

* * *

Trial Court: Then if he can't testify that he observed flooding of these two properties prior to 1997 and subsequent to 1997, then his testimony is not going to be relevant.

ODNR: Judge.

Trial Court: If you want to put him on right now, I'll hear what he has to say. And then I'll determine whether you can put him on in front of the jury.

*Id.* at 302-304.

{¶48} ODNR then proffered the testimony of Cobb outside of the hearing of the jury. While Cobb stated that he did not remember the Ebbings' two farms specifically before 1997, he was familiar with Mercer County in general and GLSM prior to 1997. He stated that he saw the Ebbings' two farms while he was riding with counsel out in the area, but does not specifically remember those properties, but only remembers the general farmland. He was able to identify two of ODNR's pictures and explained Brian Miller, a park manager at GLSM, took them.

{¶49} This was the extent of Cobb's testimony. The Ebbings once again objected to Cobb's testimony and the court once again agreed with the Ebbings and denied ODNR's request to allow Cobb's testimony in front of the jury. ODNR voiced its disapproval with the trial court's decision:

> ODNR: Judge, the only thing I want to make sure the record's [sic] clear [on] is, I recall Mr. Ebbing said he recognized the first two pictures, but that he couldn't identify the others. So if the other side would stipulate these pictures are here, that solves the first problem I have in getting these pictures admitted. I won't ask Mr. Cobb about any of those pictures. The second problem I have is that the jury has not yet heard from any employee of the Department of Natural Resources, and the only witness I will be left with then is our appraiser. And in my view, that is not fair to the State and the Department of Natural Resources because the jury wants to hear who is your client representative and why is he here; what's his name; what's his background; what level is he at. I have alluded to it in the opening, and if I'm prevented from at least introducing Mr.

> Cobb and his position and his authority, then I think the jury can draw an inference that's prejudicial to my client.
>
> Trial Court: Objection overruled.

*Id.* at 310-311.

{¶50} ODNR then called Bruce Dunzweiler, its first and only witness. Dunzweiler testified that he is a real estate appraiser. Dunzweiler was offered and accepted as an expert witness, without any objection from the Ebbings.

{¶51} Dunzweiler testified that his report provides a "before-and-after analysis" in that he formed an opinion of the value of the property when it is not encumbered by a flowage easement; and also values the property after it is encumbered by a flowage easement. *Id.* at 320. Dunzweiler, unlike Vannatta, valued the two farms separately. For Ebbing East Farm, Dunzweiler valued the before value $639,200 and Ebbing West Farm at $498,800, for a total value of $1,138,000.[9] After the flowage easement, Dunzweiler stated that it was his opinion that Ebbing East Farm was valued at $340,000 and Ebbing West Farm was valued at $261,000, for a total value of $601,000.[10] Thus, Dunzweiler subtracted the difference of values before and after the flowage easement and

---

[9] Dunzweiler valued Ebbing East Farm at $9,400 per acre and Ebbing West Farm at $8,600 per acre before the flowage easement.
[10] Dunzweiler valued Ebbing East Farm at $5,000 per acre and Ebbing West Farm at $4,500 per acre after the flowage easement.

came to the conclusion that ODNR owed the Ebbings $237,800 for Ebbing West Farm and $299,200 for Ebbing East Farm – a total of $537,000 in damages.

{¶52} Dunzweiler stated that he had reviewed Vannatta's report and the reason he believed they came to such different conclusions was that Vannatta relied on different assumptions. Specifically, Dunzweiler testified:

> The other appraiser assumed there was no water, no flooding that happened in the before. Well, the properties, both of them, are in the floodplain and documentation through FEMA flood maps that they have been in the floodplain prior to the spillway reconstruction and for some time before that.
> With it, he also used sales with improvements such as houses, and an adjustment was made to acknowledge the house and/or set of building as they applied, but with it, it's taking opinion. * * *
> * * * And with it, appreciation was factored; and I think it was 13 percent. And it was factored into infinity or for some time to come. And right now we're experiencing some fluctuation in the commodity pricing. So what was a $7 corn last year is now $5 corn; the same thing with the soybeans. I think it was 15 last year, and it's about 12 or 13 now. So with that, the commodity prices can influence the price of land for agricultural purposes.

*Id.* at 321-322.

{¶53} On cross-examination Dunzweiler testified that he does not know how often the Ebbings' properties have flooded since 1997. Dunzweiler stated that he tried to ask the Ebbings about the flooding but was unsuccessful because the Ebbings' attorneys told them not to speak with Dunzweiler.

{¶54} After Dunzweiler's testimony, ODNR sought to admit Exhibits 1, 2, 4, 7, 11, 15-19, and 21-28. The Ebbings stipulated to the admission of Exhibits 1

and 2 and did not object to the admission of Exhibit 7. The Ebbings objected to one out of five photographs contained in Exhibit 11, however the trial court overruled their objection and admitted Exhibit 11, in its entirety, into evidence. The Ebbings also objected to Exhibits 4, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, and 28. The trial court sustained all of these objections. ODNR also sought to offer two affidavits into evidence: one from Cobb and the other from Smith; however, the trial court denied ODNR's request. ODNR then rested its case.

{¶55} Both ODNR and the Ebbings offered their closing statements and the trial court charged the jury before deliberations. While charging the jury, the trial court stated that

> [t]his case is an appropriation action brought by the State of Ohio Department of Natural Resources to acquire a permanent and perpetual flowage easement across 51.03 acres of Ebbings' 126-acre farms located in Jefferson Township, Mercer County, Ohio, to grant the State the right to intermittently but frequently, severely, and persistently flood those areas. * * * In this case, the permanent and perpetual easement which has been taken is for the increased flooding that occurred and will continue to occur as a natural result of the reconstruction of the western spillway of Grand Lake in 1997 and lack of lake-level management by the Ohio Department of Natural Resources which flooding is intermittent but frequent, severe, and persistent.

*Id.* at 456.

{¶56} On August 30, 2013, the jury returned its verdict and awarded the Ebbings $764,518 in damages. $428,652 was compensation for ODNR's

permanent and perpetual flowage easement, while $335,866 constituted damages to the residual farmland.

**{¶57}** ODNR filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED BY REFUSING TO GRANT ODNR'S REQUEST FOR A JURY VIEW.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED BY ADMITTING LANDOWNERS' IRRELEVANT, PREJUDICIAL EXHIBITS AND TESTIMONY, BUT AT THE SAME TIME EXCLUDING ODNR'S RELEVANT, PROBATIVE EVIDENCE.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED BY PROVIDING THE JURY WITH PREJUDICIAL JURY INSTRUCTIONS.**

*Assignment of Error No. I*

**{¶58}** In its first assignment of error, ODNR argues that the trial court erred in denying its motion for a jury view because no unusual circumstances were present. We agree.

*Standard of Review*

**{¶59}** R.C. 163.12(A) provides that "[a] view of the premises to be appropriated or of premises appropriated shall be ordered by the court when requested by a party to the proceedings." Despite the mandatory wording of the

statute and the expressed intent of the General Assembly, the Supreme Court of Ohio has stated that "in unusual circumstances the court could exercise its discretion to deny a view." *City of Akron v. Alexander*, 5 Ohio St.2d 75, 78 (1966) (interpreting nearly identical language of former R.C. 719.10). Therefore, we review a denial of a jury view for an abuse of discretion. *Proctor v. Wolber*, 3d Dist. Hancock No. 5-01-38, 2002-Ohio-2593, ¶ 57. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶60} ODNR argues that the trial court erred in its denial of the request for a jury view because the trial court interpreted R.C. 163.12 as discretionary, not mandatory, and also because it did not articulate any unusual circumstances as the basis for its denial of the jury view. Conversely, the Ebbings argue that ODNR waived this issue on appeal by not preserving its request for a jury view at trial. Specifically, the Ebbings urge this court to view a request for a jury view as a motion in limine, and the failure of ODNR to object to the denial of its request at trial allows this court to reverse the trial court's decision only if plain error

exists.[11]  In the alternative, the Ebbings argue that the trial court properly exercised its discretion in denying the jury view because the view would have been more prejudicial than probative.  Further, the Ebbings argue that even if the trial court did err, any error is harmless.

{¶61} We note that in drafting R.C. 163.12, the General Assembly chose the word "shall" to describe the trial court's duty when faced with a party's request for a jury view.  " 'Shall'  is defined as  'will have to'  and is  'used to express a command or exhortation'  and  'to express what is mandatory.' "  *State v. Swihart*, 3d Dist. Union No. 14-12-25, 2013-Ohio-4645, ¶ 61, quoting *Webster's Third New International Dictionary* 2085 (2002).  Courts have traditionally applied the same connotation to "shall" when interpreting statutes and

---

[11] We find the Ebbings' argument that ODNR waived this issue on appeal by failing to object to the denial of the jury view at trial to be meritless.  The Ebbings want us to interpret a request for a jury view as a motion in limine, however, they cite no case law to support this proposition.  Further, a "motion in limine" is defined as

> A pretrial request that certain *inadmissible evidence not be referred to or offered at trial.* Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard.  If, after the motion is granted, the opposing party mentions or attempts to offer the evidence in the jury's presence, a mistrial may be ordered.  A ruling on a motion in limine does not always preserve evidentiary error for appellate purposes.  To raise such an error on appeal, a party may be required to formally object *when the evidence is actually admitted or excluded at trial.*

(Emphasis added.) *Black's Law Dictionary* 1171 (10th Ed.2014).  It is well-established that a jury view is not evidence. *See Alexander*, 5 Ohio St.2d at 77; *Proctor*, 2002-Ohio-2593, ¶ 56; Ohio Jury Instructions, CV 309.15.  Accordingly, we do not believe that a request for a jury view should be characterized as a motion in limine.

the duties they imposed. *E.g.*, *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("The word 'shall' is ordinarily '[t]he language of command'."), quoting *Escoe v. Zerbst*, 295 U.S. 490, 493. *See also State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, ¶ 28 ("We have repeatedly recognized that use of the term 'shall' in a statute or rule connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary.").

{¶62} Looking at other Chapters of the Revised Code only strengthens our belief that the General Assembly intended a jury view to be mandatory in appropriation cases. *Compare* R.C. 2945.16 (allowing a jury view in a criminal case "[w]hen it is proper for the jurors to have a view of the place at which a material fact occurred") *and* R.C. 2315.02 (allowing a jury view in a civil case "[i]f the court is of the opinion that it is proper for the jurors to have a view of property") *with* R.C. 163.12. The General Assembly expressly allowed a trial court to use its discretion to deny a jury view in civil and criminal cases, yet this same language is missing from R.C. 163.12.

{¶63} However, in *Alexander*, the Court looked to Section 19, Article I of the Ohio Constitution, as well as "the well-established rule that the view of the premises is not evidence" to determine that the intent of the General Assembly in enacting the jury view statute was to "provide for just compensation to a property owner and to provide the jury with assistance when the evidence is complex or

unclear." *Alexander* at 77-78. Therefore, when a jury view "would cause an injustice to the property owner *and* deprive him of compensation to which he is entitled, *and* where the evidence of valuation is not alleged to be complex or unclear, the legislative purpose would not be served in granting a view of the premises." (Emphasis added.) *Id.* at 78. As a result, the Court has delineated one narrow exception to when the trial court may deny a request for a jury view: when the view would cause an injustice to the property owner, deprive him of compensation, *and* where the evidence of valuation is not complex or unclear.[12]

{¶64} When denying ODNR's request for a jury view, the trial court arbitrarily stated that it would be "difficult for the jury to separate what the jurors would see during a jury view and what is depicted in the photographs admitted into evidence in rendering their verdict." (Docket No. 125, p. 1). However, this is not an unusual circumstance which would excuse the trial court from departing from the mandatory language of R.C. 163.12. Indeed, in every eminent domain case where a jury view is requested, the jury is faced with the task of separating the jury view from the evidence admitted at trial. Using the trial court's logic, it would never have to grant a jury view because of the possibility that the jury view might confuse the jurors during deliberations. *Accord Proctor*, 2002-Ohio-2593, ¶

---

[12] It would appear that the same logic would apply when a jury view would cause an injustice to the State and its taxpayers, and where the evidence of valuation is not complex or unclear.

61. Therefore, we find that the trial court erred in denying ODNR's request for a jury view because it did not make the proper finding as required by *Alexander*.

{¶65} We now must determine whether the error was harmless. The Ebbings argue that the error was harmless because the jury view is not evidence, could not have been considered by the jury, and therefore, could not have changed the outcome of the trial. However, if we were to accept the Ebbings' argument, then the trial court could *always* deny a jury view and it would *always* be harmless error, because jury views are *never* considered as evidence. This seems illogical, especially when the General Assembly chose the word "shall" to describe the trial court's duty when faced with a party's request for a jury view.

{¶66} The Ebbings also argue that because ODNR was able to offer a few photographs of the Ebbings' properties dry and with crops growing, it was not prejudiced. We disagree. We find that this case exemplifies an appropriation case where the evidence of valuation is complex and unclear, mainly because of the evidence the Ebbings offered. The Ebbings were able to admit numerous photographs of the spillway, and properties other than the Ebbings' two farms under the guise that they portrayed "negative external factors." The jury should have had the ability to view the properties in order to give context to all of the evidence the Ebbings produced at trial and determine what impact, if any, these negative external factors had on the Ebbings' two farms.

**{¶67}** Accordingly, we sustain ODNR's first assignment of error.

*Assignment of Error No. II*

**{¶68}** In its second assignment of error, ODNR contends that the trial court erred in admitting the Ebbings' irrelevant and prejudicial exhibits and testimony, while excluding its own relevant and probative evidence. We agree in part and disagree in part.

**{¶69}** Trial courts have the broad discretion in determining whether to admit or exclude evidence. *Deskins v. Cunningham*, 3d Dist. Union No. 14-05-29, 2006-Ohio-2003, ¶ 53, citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83 (1985). "Accordingly, a trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion." *Moore v. Moore*, 182 Ohio App.3d 708, 2009-Ohio-2434, ¶ 15 (3d Dist.).

**{¶70}** On appeal, ODNR argues that the trial court made three specific evidentiary errors: (1) admitting images of the reconstructed spillway overtopping and of general flooding in the GLSM area; (2) admitting Vannatta's report, which did not conform to the standard for calculating compensation under Ohio law and contained inflammatory photographs; and (3) excluding ODNR's witnesses and photographs. We will discuss each of ODNR's arguments in turn.

*Photographs of Spillway & Surrounding Areas*

**{¶71}** ODNR's first contention is that the trial court erred in allowing pictures of the reconstructed spillway overtopping and general flooding in areas surrounding the Ebbings' properties. While ODNR argues that these pictures are irrelevant, the Ebbings argue they are significant in valuing the Ebbings' properties. Specifically, the Ebbings argue these pictures depict "negative external factors" that an informed and willing buyer would consider before purchasing the Ebbings' properties.[13]

**{¶72}** In the case sub judice, the Ebbings are not only entitled to compensation for the property taken, but are also entitled to damages for the residual land that remains after the taking. *See City of Steubenville v. Schmidt*, 7th Dist. Jefferson No. 01 JE 13, 2002-Ohio-6894, ¶ 16; *Hurst v. Starr*, 79 Ohio App.3d 757, 762 (10th Dist.1992). Damage to the residue is measured by the difference between the pre-appropriation and post-appropriation fair market value of the residue. *Schmidt* at ¶ 16; *In re Appropriation for Hwy. Purposes of Lands of Williams*, 15 Ohio App.2d 139, 143-144 (3d Dist.1968). In determining the fair market value of the remaining property before and after the taking, every factor

---

[13] We find it interesting that the crux of the Ebbings' argument revolves on what an "informed and willing buyer" would consider before buying their properties, when they allege that they were not informed buyers. Stanley admitted to owning more than eight properties in the area and witnessing massive flooding in the GLSM area in 2003 and 2005, yet unbelievably did not know or did not think to ask if Ebbing East and Ebbing West were affected by the reconstructed spillway.

that a prudent businessperson would consider before forming a judgment in making a purchase is relevant. *Lands of Williams* at 144. "Accordingly, any element of damage that makes 'the residue less valuable in its separate state after its taking than it was as a part of the whole before the taking' may properly be considered." *City of Hilliard v. First Industrial, L.P.*, 158 Ohio App.3d 792, 2004-Ohio-5836, ¶ 5 (10th Dist.), quoting Knepper & Frye, *Ohio Eminent Domain Practice*, 270-271, Section 9.06 (1977). Such factors include the loss of ingress and egress and "any other losses reasonably attributable to the taking." *Id.*

{¶73} Vannatta testified that he believed "overtopping, hydroplaning, * * * danger of trying to get to your property or maybe not being able to get to it at all" are external factors that a prudent businessperson would consider before purchasing the Ebbings' properties. We agree that interference with entering and leaving one's property is a factor that a prudent businessperson would consider before purchasing property. Similarly, road closures, within a close proximity of the properties, would be equally as relevant when valuing the residue. However, Vannatta testified that the highest and best use of the Ebbings' property was farm use, and thus, a prudent businessperson would be less concerned with occasional road closures to undeveloped farmland than he would be to residential properties. If flooded, the farmland cannot be worked and the lack of access to such land is of minimal importance.

{¶74} ODNR also takes issue with the Ebbings' Exhibits D and L which depict the reconstructed spillway, three-and-one-half to five miles away from the Ebbings' properties. Again, the Ebbings argue that these pictures are relevant because they are also factors that a prudent businessperson would consider before purchasing property. We disagree. The relevance of these photographs becomes more attenuated the farther away they are from the Ebbings' properties. The more photographs depicting the overtopping spillway, the more they become cumulative and have the potential to prejudice ODNR.

{¶75} In this case, the Ebbings admitted numerous photographs depicting the overtopping spillway and general flooding: Exhibits D, E, L, M-1, M-2, Z, and BB. Further, pages 35, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, and 56 of Vannatta's report contain similar images. In fact, some of the exact photographs that were offered as Exhibits are then also included in Vannatta's report. For example, Exhibit D is the same image as page 35 of Vannatta's report. Exhibits E and L are repeated on pages 46 and 47 of Vannatta's report. Lastly, Exhibits Z and BB are identical to pages 52 and 54 of Vannatta's report.

{¶76} While perhaps one image of the overtopping spillway would be relevant, the fact that the trial court allowed so many cumulative, duplicative, and unnecessary photographs was error. Moreover, pictures of general flooding on properties other than the Ebbings' properties are irrelevant in determining the

value of the Ebbings' properties. It also has the potential to confuse the jury, especially in light of the fact that the trial court arbitrarily refused the jury view of the property, which would have placed these photographs in context. This error is also exacerbated by the fact that the trial court refused ODNR the ability to present its own evidence concerning issues raised by the Ebbings at trial and when it refused to allow Cobb to testify as to his knowledge about the general GLSM area, which will be discussed in more detail later.

*Vannatta's Report*

{¶77} While ODNR filed a motion in limine to exclude certain portions of Vannatta's report and testimony, it did not object at trial when Vannatta testified or when his report was offered into evidence. Accordingly, we will review whether the trial court committed plain error in allowing Vannatta's report and testimony into evidence. " 'In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *.' " *Am. Builders & Contrs. Supply Co., Inc. v. Frank's Roofing Inc.*, 3d Dist. Marion No. 9-11-41, 2012-Ohio-4661, ¶ 17, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

{¶78} ODNR argues that Vannatta's report was erroneously admitted into evidence because it did not take into account that flooding had occurred on the property before the take,[14] it increased the geographic scope of the take, and it contained inflammatory and irrelevant photographs.[15]

{¶79} As to its first argument, ODNR stated that Vannatta inflated the pre-appropriation values for the Ebbings' farms by assuming that no flooding occurred prior to 1997, and that all post-1997 flooding was attributable to ODNR. ODNR points to the second page of Vannatta's report which states, "In the before I necessarily suppose that the new spillway improvements are yet to be accomplished. No trespass or encroachments have occurred and the whole of the study farms is yet to be inundated or damaged." (Exhibit Y, p. 2). However, ODNR ignores page 16 of Vannatta's report which acknowledges that the Ebbings' properties are within the 100-year floodplain. Specifically, Vannatta states "a portion of Farm #1 and a portion of Farm #2 are located in a 100-year floodplain identified as 'Zone AE,' which appears to mirror that of the take areas of each farm." (*Id.* at 16). Vannatta explained on direct examination why he

_____

[14] This issue is much confused by the fact that the trial court set the date of the take as the date of trial and there was considerable testimony that flooding had occurred frequently since 1998. However, the parties each offered evidence "before the take" as of 1997.

[15] We note that in its motion in limine, ODNR also argued that Vannatta's report should be excluded because he used diminished crop yields in the valuation of the damage to the residue estate. However, because ODNR abandoned this argument on appeal, we will not address the merits of this argument.

believed that any flooding that occurred prior to the new spillway was insignificant in his valuations:

Q: Is some of the Ebbings' property in the hundred-year floodplain?

A: Yes.

Q: Was that significant in the purchase price of comparable sale number three?

A: No, I don't believe so.

Q: In your 43 years of experience, Mr. Vannatta, is farmland typically negatively affected by being within the 100-year floodplain in terms of its value?

A: It depends on the property, but generally no. Normally, if it's within that 1 percent chance, my experience is a lot of that is what we term bottomland. It really has pretty good soils, and they can be as productive as soils that aren't in a flood zone.

Trial Tr., p. 237-238.

{¶80} Thus, it appears that while Vannatta acknowledged that the Ebbings' properties are within the 100-year floodplain, it was insignificant when computing his valuations. ODNR did its best to attack Vannatta's credibility and the fact that he did not factor in the 100-year floodplain into his valuations on cross-examination.

Q: So in your before valuation, aren't you supposing that no flooding occurred prior to '97?

A: No, I'm not because I think I explained earlier that I looked back to '97, considering what the type of flooding and things that were happening in my valuation. I'm looking back there to try to do --

that's why it's hypothetical back there, the general condition of that property and the effects that were going on back then.

*Id.* at 255. Further, Vannatta admitted on cross-examination that he did not meet with a hydrologist or engineer to determine how much the Ebbings' properties flooded prior to the redesigned spillway. He also admitted that he was not sure if he reviewed any of the flood data relative to 1993, 1994, 1995, 1996, or 1997.

{¶81} Therefore, it appears Vannatta did not ignore the fact that the Ebbings' properties were located within the 100-year floodplain, but instead, he chose to give it nominal consideration when determining his valuations.[16] We agree with the trial court that this issue goes towards the weight and credibility of Vannatta's report, not its admissibility.

---

[16] We find it odd that Vannatta did not give any consideration to the purchase price the Ebbings paid for their two farms in his valuation of the two properties. Indeed, at trial Vannatta testified, "I'm not sure that I even bothered to consider what [the purchase price] was. Anytime that sales over three years pass or a transaction, it's not relevant to the appraisal that I'm doing so I didn't even consider it so I don't know." Trial Tr., p. 258. However, the Supreme Court of Ohio has stated that "when the property has been subject of a recent arm's-length sale between a willing seller and a willing buyer, the sale price of the property shall be 'the true value for taxation purposes.' " *Berea City Sch. Dist. Bd. of Educ. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 269, 2005-Ohio-4979, ¶ 13. While Vannatta claimed that the purchase price was irrelevant to his valuation because it happened over three years ago, he ignores the fact that the Ebbings had purchased the two farms only *six months* before joining the *Doner* lawsuit where the Court determined that a taking had occurred. Thus, the purchase was very recent and relevant to the valuation of the Ebbings' properties. Even if the purchase price is considered too remote in time, the Supreme Court of Ohio has stated that "[e]ven if the other sales were 'too remote,' they were some indication of true value and should have been taken into account by the [Board of Tax Appeals] in its deliberations." *Dublin-Sawmill Properties v. Franklin Cty. Bd. of Revision*, 67 Ohio St.3d 575, 576 (1993). While we understand these cases deal with valuation of properties for tax purposes, we see no reason why the same principles would not be relevant in determining the valuation of property for eminent domain purposes. We would also think that when a farm is purchased approximately ten years after the flooding started it would be reasonable to consider how that prior flooding affected the purchase price and whether the seller in that instance is the one who suffered the loss. However, because this issue was not raised on appeal, we decline to address it any further.

{¶82} ODNR also argues that Vannatta's report "manipulated the post-appropriation value of the Property by arbitrarily increasing the geographic scope of the take." (Appellant's Br., p. 12). Specifically, Vannatta ignored the fact that the Ebbings stipulated with ODNR on the metes and bounds description of the flowage easement, and stated that flooding will "exceed the take area limits" and that ODNR's take is a "blanket easement of the entirety of the whole of the study Farms * * *." (Exhibit Y, p. 45).

{¶83} ODNR outlined the metes and bound description in its petition to appropriate flowage easement and fix compensation. (Docket No. 3, Exhibits A, B). The Ebbings did not dispute the metes and bound description of the flowage easement. (Docket No. 89, p. 5). In fact, in their "Notice of Submission of Proposed Order on Extent of Take" the Ebbings conceded that the jury's role in this matter was to "*only* decide the amount of compensation and damages due to the Ebbings for the taking described in the flowage easements * * *. To ensure that the jury's task *remains limited to the issue of compensation * * ** the Ebbings hereby submit a proposed order for the Court as to the extent of the take." (Emphasis added.) (Docket No. 92, p. 2).[17]

---

[17] We recognize that although the "Notice of Submission of Proposed Order on Extent of Take" was not labeled as a "stipulation" its purpose was to serve as a stipulation. *See State v. Davidson*, 17 Ohio St.3d 132, 135 (1985) ("The determination of whether a motion is a 'motion to suppress' or a 'motion *in limine*' does not depend on what it is labeled. It depends on the type of relief it seeks to obtain."); *see also Lingo v. State*, 138 Ohio St.3d 427, 2014-Ohio-1052, ¶ 38 ("Regardless of how an action is labeled, the substance of

{¶84} The issue of the "extent of the take" was a matter that had to be decided before the trial. R.C. 163.14; *see also Wray v. Fitch*, 95 Ohio App.3d 249, 253 (9th Dist.1994) ("In appropriation cases, it is the court's duty to define the extent of 'the taking' and the jury's duty to determine the amount of damages as a result of 'the taking.' "). Since the Ebbings stipulated to the extent of the take outlined in ODNR's petition for appropriation, it cannot contradict this stipulation by having its expert testify at trial that ODNR's take will encompass *more* than what they had previously stipulated. Once a party has agreed to a stipulation, it may not retract or withdraw from it without the consent of the other party or by leave of court on good cause. *DeStephen ex rel. DeStephen v. Allstate Ins. Co.*, 10th Dist. Franklin No. 01AP-1071, 2002-Ohio-2091, ¶ 17.

{¶85} Thus, any evidence that altered the "extent of the take" was irrelevant, confusing to the jury, and highly prejudicial. The trial court erred when it failed to strike this portion of Vannatta's report and exclude this portion of Vannatta's testimony at trial.

---

the party's arguments and the type of relief requested determine the nature of the action."). A stipulation is a "voluntary agreement between opposing counsel concerning the disposition of some relevant point so as to obviate the need for proof or to narrow the range of litigable issues." *Horner v. Whitta*, 3d Dist. Seneca No. 13-93-33, 1994 WL 114881, *1, quoting 89 Ohio Jurisprudence 3d (1989), Trial, Section 69. This is exactly what the Notice of Submission did. It was a voluntary agreement between ODNR and the Ebbings which narrowed the range of litigable issue. The Ebbings did not feel the need to litigate the issue of the "extent of the take" to the trial court, and instead, chose to stipulate to the metes and bounds description found in ODNR's petition for appropriation. We also note that Notice of Submission was never signed or filed by the trial court judge. However, the trial court made an oral ruling, granting the Ebbings' request to have the metes and bounds description represent the extent of the take. *See* Aug. 16, 2013 Pre-Trial Conference Tr., p. 16-21.

{¶86} Lastly, ODNR argues that pages 48 and 49 of Vannatta's report should have been excluded because they were irrelevant and highly prejudicial. Specifically, through a motion in limine, ODNR sought to exclude certain images found in Vannatta's expert report which depicted a newspaper article concerning the near-drowning of a teenage girl after she attempted to cross a flooded road in her car.[18] At a pretrial conference, ODNR stated that these images were "prejudicial and inflammatory." Final Pretrial Conference Tr., p. 31. The Ebbings argued that this news article was relevant because it demonstrated the "negative external effects" of the flowage easement and thus affects the value of the residual farmland to potential buyers. During the final pretrial conference, ODNR argued:

> ODNR: Thank you, Judge. Let me just -- and, again, not to belabor the point. There is one picture of an article that shows a 19-year-old woman who allegedly nearly drowned when she maybe foolishly tried to take her vehicle and cross a road that had been flooded out. And with regard to that picture, I'm simply asking the court. Does the court agree with [ODNR] that that reference is so unrelated to compensation of land on the 58-acre and 68-acre parcel that reference should at least be excluded and that the rest of it comes in and given weight?

---

[18] These images are contained on pages 48 and 49 of Vannatta's report. On page 48 there are two images: one showing a "road closed" sign with a flooded road behind it; the second image similarly shows a flooded road. Below both images is a caption that reads: "The site above is located adjacent to the north side of the Wabash River along State Route 49, which is near the location where a 19-year-old girl almost died Monday February 28, 2011, due to swift high water from the Wabash overtopping State Route 49." There are two images on page 49: the first is an image of a newspaper article with the headings "Communities flooded with woes" and "Divers pull woman from car." Under this second heading you can read part of the newspaper article that says "A 19-year-old Fort Recovery woman remains in critical condition today after being pulled from a nearly submerged car Monday night in the area of state [sic] Route 49 and 29, north of St. Anthony." The second image is of a car that washed off the roadway, and is partially submerged by the flooded waters.

\* \* \*

> Trial Court: Well, subject to the testimony of Mr. Vannatta, but as evidenced at the top of the page from this report, page 49, of the picture contained in Mr. Vannatta's report, if in fact his testimony is this would affect what a willing buyer would pay for the property, then the court doesn't believe that the prejudicial effect outweighs the probative value, and the law requires that the prejudicial value be unfair. And I don't believe this is an unfair prejudice position.

*Id.* at 34, 36-37.

**{¶87}** Despite ODNR's motion in limine and its adamant objection to the news article at the final pretrial conference, ODNR failed to make this specific objection again at trial, thus waiving all but plain error.

**{¶88}** Under Evid.R. 402, "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute \* \* \*, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In conjunction with these rules is Evid.R. 403(A), which states, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury."

{¶89} We do not find that the newspaper article that depicts a teenage girl nearly drowning relevant to the valuation of the Ebbings' properties. The incident appears to be isolated and happened miles away from the property, and therefore, has an insignificant impact on the market value of the Ebbings' property. We note again that the Ebbings' property is farmland and find the necessity of traveling nearby roads during floods is negligible. Further, even if we did find that it was relevant, its probative value is substantially outweighed by its prejudicial effect. Its overriding effect is to enflame the passions of the jury, and that effect is exacerbated by the inclusion of the article along with the pictures. Thus, the trial court erred in admitting the images on pages 48 and 49 of Vannatta's report into evidence.

{¶90} For reasons detailed more fully below, we find that these errors constitute plain error.

*Exclusion of ODNR's Witnesses & Evidence*

{¶91} Finally, ODNR argues that the trial court erred in excluding its own witnesses and evidence regarding ODNR's resumption of lake level management practices at GLSM and a storm event in January of 2013.

{¶92} On appeal, ODNR does not specifically tell this court why the images of the January 2013 flood event were relevant in determining the value of the Ebbings' properties. However, at a pretrial conference, ODNR argued that

these images were relevant to determine "the extent of the take [and] * * * the fair market value of the property taken." August 16, 2013 Pretrial Conference Tr., p. 27. The trial court was correct in determining that these photographs would not be admissible to determine "the extent of the take," as that issue had already been decided and was not an issue for the jury. Further, we fail to see how the January 2013 flooding event is relevant to the issues of valuation, just because it was determined that the flood was not caused by the spillway. Without any other explanation as to the relevance of these photographs, we cannot find that the trial court abused its discretion in excluding these photographs.

{¶93} The trial court also excluded three of ODNR's witnesses, who purportedly were to testify in regard to ODNR's resumption of lake level management practices at GLSM. ODNR believed that this evidence was relevant to determine the extent of the take and also relevant to the issue of future flooding. However, the trial court agreed with the Ebbings and found that what ODNR has done or will do in the future to minimize its use of the easement is irrelevant to the valuation of the permanent flowage easement.

{¶94} Determining the value of property to be appropriated is a two-step process. *City of Middletown v. Campbell*, 21 Ohio App.3d 63, 66 (12th Dist.1984). "First, the date of take must be ascertained, and then, the value of the property *on that date*." (Emphasis added.) *Id.*; *see also Evans v. Hope,* 12 Ohio

St.3d 119, 121 (1984) ("Having already determined the date of take to be July 1981, the subject property must be valued as of that date."). The trial court determined that the date of the take was the date of trial, August 28, 2013.[19] *See* Trial Tr., p. 458. Thus, what ODNR was doing in regard to lake level management *prior to and at the date of the take* was relevant.[20]

{¶95} Further, in *Doner* the Supreme Court of Ohio made clear that ODNR is liable for the "damage to downstream landowners caused by the intermittent, but inevitably recurring flooding that resulted from the new western spillway." *Doner* at ¶ 85. However, the Court was equally as adamant that ODNR should "commence appropriation proceedings to *determine the amount of their taking* of the property" and that the "determination of the *extent of the taking* will be made

---

[19] Neither party appealed the trial court's decision to determine the date of take as August 28, 2013. We note that the date of take is an important decision to be made by the trial court as it determines when the property should be valued. For example, in *Director of Highways v. Olrich*, 5 Ohio St.2d 70, 73 (1966), the Court makes clear that any damage to a property before the date of take is "the owner's loss, while [damage] that occurs after the taking is the loss of the appropriator." *See also In re Appropriation for Hwy. Purposes Land of Winkelman*, 13 Ohio App.2d 125 (3d Dist.1968), paragraph one of the syllabus (finding that "the market value of the land shall be determined on the basis of the circumstances existing *the moment before the take*"). Therefore, by the trial court determining the date of take is the date of trial, all damage that occurred to the Ebbings' properties before 2013 would be attributable to the Ebbings, not ODNR. This seems illogical and it is not how the parties proceeded. However, because the trial court determined that the date of take was the date of trial, and because no party challenged the date of take on appeal, we must use the date of take the trial court set in our analysis. Therefore, all circumstances existing the moment before the take, i.e., the date of trial, are relevant to determining the value of the properties, including the resumption of lake level management practices.

[20] It is important to note that "[a]ll rights sought to be appropriated in eminent domain must be taken absolutely and unconditionally." 26 Am. Jur. 2d Eminent Domain § 119. Accordingly, the government "must take absolutely whatever rights it seeks to appropriate, paying in full for such rights, *regardless of future intentions or statements regarding them*." (Emphasis added.) *Id.* Our holding is limited to measures that ODNR had taken *prior to the date of the take*. Any declarations of future intentions by ODNR should not be considered by the jury.

by the court presiding over the appropriation proceeding." (Emphasis added.) *Id.* at ¶ 86. While the parties agreed as to the extent of the taking, the trial court allowed Vannatta to testify that ODNR's taking would actually *exceed* that to which both parties had already stipulated. Again, this error was exacerbated when the trial court prohibited ODNR from attacking Vannatta's statement by presenting evidence about the resumption of lake level management practices, which might have shown the jury that the taking *will not exceed* the flowage easement.

{¶96} Moreover, the trial court allowed all of the Ebbings' witnesses to testify, at great length, as to the "negative external factors" of ODNR's taking, which affects the value of the residual land. Again, the trial court prohibited ODNR from countering this evidence by presenting its own evidence about its current lake management practices which, according to ODNR, has helped prevent some of these "negative external factors" from happening as frequently at the date of take. We fail to see how a "willing, informed buyer" would only want to be aware of "negative external factors" but would not take into consideration any present efforts by ODNR to lessen these negative external factors. The Ebbings cannot have it both ways: present unfavorable evidence about "negative external factors" that are created by ODNR but then prohibit ODNR from presenting its

own evidence about measures that it has already implemented, at the time of the take, to counter those same "negative external factors."

{¶97} Lastly, the trial court denied ODNR's request to have Glenn Cobb testify as to his general knowledge of the GLSM area. ODNR wanted Cobb to testify as to the conditions before and after the construction of the 1997 spillway. The trial court denied ODNR's request stating that Cobb could not provide any relevant testimony since he did not have any specific, personal knowledge of the Ebbings' properties. *See* Trial Tr., p. 305-310. However, as mentioned above, the trial court allowed the Ebbings to present numerous and duplicative photographs that depicted properties other than the Ebbings' two farms. The trial court even allowed Vannatta to testify as to prejudicial events that happened miles away from the Ebbings' properties, like the near-drowning incident of a teenage girl, and Mr. Post's fear that an EMS truck would not be able to reach his property. Thus, the trial court allowed the Ebbings to present their own favorable evidence of the general GLSM area, but prohibited Cobb from testifying as to his general knowledge of the GLSM area.

{¶98} We find that the trial court erred when it prohibited ODNR from presenting evidence which would be relevant to the value of the Ebbings' residue at the date of the take. Further, we find that the plain error doctrine must be invoked in to order to prevent a manifest miscarriage of justice. The Ebbings were

allowed to re-litigate the issue of the extent of the take in Vannatta's report and through his testimony at trial. At the same time, ODNR was prevented from presenting any testimony to counter this evidence. Again, the Ebbings were allowed to present evidence concerning the negative external factors that an informed and willing buyer would consider, but ODNR was repeatedly denied the ability to counter this evidence with their own evidence concerning the resumption of lake level management practices, which had occurred *prior* to the date of take. While the Ebbings were allowed to present evidence that portrayed the general GLSM area, ODNR's witness was prohibited from testifying as to his general knowledge of the GLSM area. The one-sided presentation of evidence resulted in an unfair trial for ODNR and we must reverse the judgment below "in order to maintain the integrity and fundamental fairness" of our judicial proceedings. *Reichert*, 18 Ohio St.3d at 224.

{¶99} In conclusion, we find that the trial court plainly erred by allowing Vannatta to testify that ODNR's taking will exceed the scope of the permanent flowage easement and by admitting the inflammatory pictures and a news article detailing how a teenage girl nearly drowned miles away from the Ebbings' two farms. We also find that the trial court erred in admitting irrelevant and duplicative photographs of the spillway and general flooding, which did not depict the Ebbings' properties. These errors are aggravated by the fact that the trial court

denied ODNR the ability to present its own evidence which would rebut issues the Ebbings raised at trial. However, we find that the portion of Vannatta's report in which he gave nominal consideration to the fact that the properties were within the 100-year floodplain was properly admitted into evidence.

{¶100} Accordingly, we overrule in part and sustain in part ODNR's second assignment of error.

*Assignment of Error No. III*

{¶101} In its third assignment of error, ODNR argues that the trial court erred in charging the jury with instructions that materially affected its substantial rights. Specifically, ODNR argues that the trial court's inclusion of the words "frequent, severe and persistent" was a mischaracterization of the nature of ODNR's flowage easement and prejudiced ODNR.

{¶102} Jury instructions are within the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown. *State v. Orians*, 179 Ohio App.3d 701, 2008-Ohio-6185, ¶ 10 (3d Dist.). Further, a reviewing court must "consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990).

{¶103} The Ebbings make a number of arguments in defense of the trial court's decision to include the words "frequent, severe, and persistent" in its jury instructions. First, they argue that it was "invited error" because ODNR's own expert, Dunzweiler, included the phrase "frequently, severely, and persistently" in its expert report, on pages 3, 39, and 85. (Appellee's Br., p. 22). This is not supported by the record. We have reviewed pages 3, 39, and 85 and fail to see where Dunzweiler used this phrase in his report.[21] Thus, we will not address whether ODNR "invited error" as to this assignment of error.

{¶104} In the alternative, the Ebbings argue that the jury instruction was appropriate because it was consistent with the Court's "language in *Doner*, conformed to the evidence before the Supreme Court [of Ohio] and the trial court, and reflected terms previously accepted by ODNR." (*Id.*). Further, they argue that even if the trial court did err in permitting this jury instruction, it did not affect ODNR's substantial rights, and was thus harmless.

{¶105} Initially, we note that the Supreme Court of Ohio used the phrase "intermittent and inevitably recurring" to describe the ODNR's flooding. It never used the phrase "frequently, severely, and persistently" in its opinion, except once when quoting the Court of Common Pleas of Mercer County's decision of *State ex*

---

[21] We do not see the phrase used anywhere on page 3 of Dunzweiler's report; page 39 contains a map that has no text on the page, let alone the aforementioned phrase; and page 85 contains a comparable land sale which does not describe ODNR's flowage easement.

*rel. Post v. Speck*, Mercer App. No. 10-2006-001, 2006-Ohio-6339. The Court never again used the word "persistent" in its opinion. While the Court used the word "severe" four other times in its opinion, it only was when it was recapitulating the experts' testimony. However, the Court did describe the flooding caused by ODNR as "frequent" several times throughout its opinion. *Doner*, ¶ 18, 69, 80. Thus, we cannot find that the word "frequent" was improper in the jury instruction, and are left to determine if the words "severe" and "persistent" were erroneous and prejudicial.

{¶106} We find that the words severe and persistent could arguably describe the flooding in the case. As to severity, Vannatta testified that flooding impacts 40% of both farms. Stanley testified that the flooding usually lasts for a week to two weeks and the flooding can be four to 10 feet deep. Further, Stanley testified that the flooding caused blowouts, bank erosion, soil erosion, soil compaction, and that heavy debris will wash up on his farm during the flooding. As to persistent, Zumberge testified that Ebbing West and East Farms have flooded "most years since [August 1998] * * *." Stanley testified that his properties have flooded in 2009, 2010, 2011, and 2013. Thus, there was evidence that ODNR's flooding was severe and persistent.

{¶107} While it may have been better practice for the trial court to simply use the language contained in the syllabus of *Doner*, we cannot find that the

court's use of the words, frequent, severe, and persistent, was erroneous or prejudicial in these specific circumstances.

{¶108} Accordingly, we overrule ODNR's third assignment of error.

*Cumulative Error*

{¶109} On appeal, ODNR argues that:

[t]he cumulative effect of the trial court's errors prevented ODNR from receiving a fair trial. Each error described above demonstrates an abuse of discretion that must be remedied. * * * The combination of these errors left the jury with a false impression that the Property was continuously underwater, unusable, and devoid of all value.

(Appellee's Br., p. 16). Without acknowledging that Ohio Appellate Courts and Federal Appellate Courts are split on the issue of whether cumulative error is appropriate in civil cases, ODNR urges this court to apply the cumulative error doctrine in the present matter.

{¶110} The cumulative error doctrine is usually used in criminal cases and holds that "a judgment may be reversed if the cumulative effect of multiple errors deprives a defendant of his constitutional rights even though, individually, the errors may not rise to the level of prejudicial error or cause for reversal." *In re Guardianship of Clark*, 10th Dist. Franklin No. 09AP-96, 2009-Ohio-3486, ¶ 27, citing *State v. Garner*, 74 Ohio St.3d 49 (1995).

{¶111} The Supreme Court of Ohio, in a civil case, has stated:

"Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors

> occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision."

*O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980), quoting *Hallworth v. Republic Steep Corp.*, 153 Ohio St. 349 (1950), paragraph three of the syllabus. While the *O'Brien* case specifically referred to the plural "errors" in evaluating substantial justice, the case only dealt with one type of error, and did not mention the cumulative error doctrine. *Id.* at 165; *see also Bigler v. Personal Serv. Ins. Co.*, 7th Dist. Belmont No. 12 BE 10, 2014-Ohio-1467, ¶ 173.

{¶112} The Tenth, Eleventh, and Twelfth Districts have stated that the cumulative error doctrine is not typically applied in civil cases, and those courts have been reluctant to apply it. *See Westlake v. Ohio Dept. of Agriculture*, 10th Dist. Franklin Nos. 08AP-71, 08AP-72, 2008-Ohio-4422, ¶ 25 ("In Ohio, the cumulative error doctrine is not typically employed in a civil context."); *Skyes v. Gen. Motors Corp.*, 11th Dist. Trumbull No. 2003-T-0007, 2003-Ohio-7217, ¶ 39 ("In Ohio, the cumulative error doctrine is not universally employed in a civil context."); *Allen v. Summe*, 12th Dist. Butler No. CA92-04-067, 1993 WL 156184, *2 ("This court is somewhat reluctant to apply the cumulative error doctrine in civil cases."). The Second District has recognized that it has taken inconsistent positions on whether the cumulative error doctrine is appropriate in civil cases. *Ratliff v. Brannum*, 2d Dist. Greene No. 2008-CA-05, 2008-Ohio-6732, ¶ 155. On

the other hand, the First, Seventh, and Eighth Districts have affirmatively stated that they would apply the cumulative error doctrine in civil cases. *See Katz v. Enzer*, 29 Ohio App.3d 118, 124, (1st Dist.1985) (actually applying cumulative error); *Bigler*, 2014-Ohio-1467, ¶ 175; *Edge v. Fairview Hosp.,* 8th Dist. Cuyahoga No. 95215, 2011–Ohio–2148.[22]

**{¶113}** We find that some of the errors committed by the trial court are reversible on their own. In the alternative, however, we would apply the cumulative error doctrine and reverse the trial court's judgment. Under the unique circumstances of this case, and because of the multiple errors of the trial court, we believe that applying the cumulative error doctrine is necessary to protect the substantial rights of ODNR. When viewing all the errors cumulatively, it only confirms that ODNR was prevented from receiving a fair trial. First, the trial court arbitrarily denied ODNR's request for a jury view. It then allowed the Ebbings' expert to include in its report and to testify at trial, that ODNR's taking would

---

[22] Among Federal Appellate Courts, this issue is similarly undecided. The Third Circuit Court of Appeals has affirmatively stated that it does not apply cumulative error in civil cases. *See U.S. S.E.C. v. Infinity Group Co.,* 212 F.3d 180, 196 (3d Cir.2000). The Fourth, Tenth, and Eleventh Circuits have all indicated that their courts have not affirmatively determined the issue of whether cumulative error applies in civil cases. *See Greig v. Botros*, 525 Fed.Appx. 781, 795 (10th Cir.2013); *Esoteric, LLC v. One (1) 2000 Eighty-Five Foot Azimut Motor Yacht Named M/V STAR ONE*, 478 Fed.Appx. 639, 641 (11th Cir.2012); *Anthony v. Ward*, 336 Fed.Appx. 311, 322 (4th Cir.2009). On the other hand, the Second, Sixth, Seventh, Ninth, and Federal Circuits have all stated that they would apply the cumulative error doctrine in civil cases (and some have actually applied it to reverse a judgment). *Malek v. Federal Ins. Co.*, 994 F.2d 49, 55 (2d Cir.1993); *Kendel v. Local 17-A United Food & Commercial Workers*, 512 Fed.Appx. 472, 485 (6th Cir.2013); *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir.2013); *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir.2005); *Hendler v. United States*, 952 F.2d 1364, 1383 (Fed.Cir.1991).

exceed the flowage easement, contrary to what the Ebbings had stipulated to before the trial. The trial court denied ODNR's request to present Cobb as a witness despite having general knowledge of the GLSM area because he had no personal knowledge of the Ebbings' properties. However, it allowed duplicative evidence from the Ebbings concerning properties that were in the general GLSM area but not near the Ebbings' two farms. Finally, it allowed the Ebbings to show highly prejudicial and irrelevant photographs depicting a teenage girl nearly drowning in her car, miles away from the Ebbings' properties.

{¶114} There is no doubt that ODNR has taken a permanent flowage easement on the Ebbings' properties and in turn, the Ebbings deserve just compensation. However, ODNR, just like the Ebbings, is entitled to a fair trial free from arbitrary decisions by the trial court.

{¶115} Having found no error prejudicial to ODNR in the third assignment of error in its entirety and in the second assignment of error in part, but having found error prejudicial to ODNR in the first assignment of error in its entirety and the second assignment of error in part, we reverse the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**PRESTON, J., concurs in Judgment Only.**

**/jlr**

**SHAW, J., DISSENTS***:*

### *First Assignment of Error*

{¶124} For the same reasons stated in the majority opinion of this court in *ODNR v. Knapke Trust*, 3d Dist. Mercer No. 10-13-25, I do not believe the trial court erred in denying a jury view in this case and I respectfully disagree with the majority's disposition of this assignment of error. I concur fully with the analysis of the trial court on this issue as set forth in the majority opinion and I would overrule ODNR's first assignment of error.

### *Second Assignment of Error*

{¶125} As stated in the majority opinion of this court in *ODNR v. Knapke Trust*, I agree with the majority in this case that admission of the photograph of the near drowning victim, included in Vannatta's appraisal report, was error. However, unlike the majority, I do not believe admission of the photograph constituted reversible error, either alone or cumulatively with any other error in this case.

{¶126} As for the ODNR witnesses excluded by the trial court, I concur fully with the analysis and decision of the trial court regarding these witnesses as set forth in the majority opinion. I respectfully disagree with the analysis and conclusions of the majority regarding the significance of these witnesses to

ODNR's case, or more importantly, to the *sole* issue before the jury as to the *valuation* of the take, without regard to the *future* intentions of ODNR.[23]

{¶127} Nor do I agree with the majority's application of either a "plain error" or "cumulative error" doctrine in these circumstances.[24]  On the contrary, I would find any error in this regard to be harmless, given the totality of evidence presented as to the amount of flooding, crops destroyed, tile blowouts, erosion, soil compaction, debris carried onto the land, and the inherent reasonableness of the jury's award relative to the opposing expert appraisals in this case.

{¶128} For the foregoing reasons, I respectfully disagree with the majority disposition of this assignment of error.  I would overrule the second assignment of error.

### Third Assignment of Error

{¶129} I concur with the analysis and disposition of the majority in overruling ODNR's third assignment of error regarding the jury instructions, which is largely aligned with the analysis and disposition of the similar assignment of error in *ODNR v. Knapke Trust*.

---

[23] Part of Jury Instruction No. 2 read in this case, "In determining the damages to award the Ebbings, you must assume the Plaintiff will make the fullest and most damaging use reasonably foreseeable of the permanent and perpetual flowage easement *regardless of any future intentions, future promises or statements regarding future intentions or promises by the Plaintiff*."  (Emphasis added).  This jury instruction alone would make any such testimony about future undertakings irrelevant.

[24] I would stress that whether cumulative error is actually applicable in civil cases has yet to be determined by the Ohio Supreme Court or the United States Supreme Court, and that Ohio Appellate Courts and Federal Circuit Courts are split as to its application.

### *Conclusion*

**{¶130}** For all of the foregoing reasons, and despite some areas of agreement on certain individual issues noted above, I respectfully dissent from the decision of the majority to reverse this case.[25]

**{¶131}** I would affirm the jury verdict and judgment of the trial court.

---

[25] I would note that I specifically do not endorse the many footnotes in the majority opinion, which purport to find potential errors and irregularities that were not raised by either party.